**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Harold PARKER, Defendant-Appellant.**

**No. 11823.**

United States Court of Appeals
Seventh Circuit.

May 27, 1957.

Rehearing Denied July 8, 1957.

Loring B. Moore, Chicago, Ill., William R. Ming, Jr., George N. Leighton, Chauncey Eskridge, Chicago, Ill., for defendant-appellant, Moore, Ming & Leighton, Chicago, Ill., of counsel.

Robert Tieken, U. S. Atty., Mitchell S. Rieger, Asst. U. S. Atty., Chicago, Ill., for appellee, John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., of counsel.

Before MAJOR, FINNEGAN, and LINDLEY, Circuit Judges.

FINNEGAN, Circuit Judge.

Parker, defendant, was convicted by a jury on the first and second counts of an indictment grounded in 18 U.S.C. § 1621 which provides in relevant part that: "Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose * * * or that any written testimony, declaration, deposition * * * is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury, and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both." Counts Three and Five of the

indictment were dismissed on the government's motion and defendant was found not guilty on the fourth count. After arguments his motion for a new trial was denied and Parker was sentenced to serve three years on the first and second counts, respectively, and fined $1000 and costs on each count, sentences to run concurrently and fines cumulative.

In obedience to a subpoena, Parker appeared and testified under oath on January 20, 1955 before the January, 1955 Federal Grand Jury. Subsequently he was accused by the August Grand Jury, on the two counts under which he now stands convicted, with having allegedly untruthfully testified before the January grand jurors, in substance that: (1) "he had not been in New York, N. Y. since 1945 when he was discharged there" and, (2) "he had never met Claude Murphy, but saw him for the first time in 1953 in Luther Rawlings' Tavern, and thereafter only spoke with him casually in said tavern or passed him on the street * * *" While the other three counts are also charges of perjury before the January, 1955 Grand Jury their disposition, already noted, make it unnecessary to further describe them.

Relying upon the interdiction of the Fifth Amendment that no person shall "* * * be compelled in any criminal case to be a witness against himself * * *." Parker mounts an attack aimed at the evidentiary basis of his perjury conviction. He attempts to cut ground from under the evidence lying behind the petit jury's verdict with a theory that the several critical counts based upon his own testimony given before the January, 1955 Federal Grand Jury are tainted by an absence of any previous warning to him of his constitutional privilege against self-incrimination. Stated still another way, Parker argues that since the United States Attorney failed to apprise him of his constitutional right, the evidence upon which the indictment is bottomed, having been "illegally" obtained, cannot support the charges regardless of the truth or falsity of Parker's utterances to the Jan-

uary grand jurors. We disagree. While there are a number of other defense points tendered by this appeal we think the Fifth Amendment issue significant enough for attention at the outset.

Blair v. United States, 1919, 250 U.S. 273, 281–282, 39 S.Ct. 468, 471, 63 L.Ed. 979, contains Mr. Justice Pitney's neat capsuled version of some background material:

"* * * it is clearly recognized that the giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the government is bound to perform upon being properly summoned * * *. The duty, so onerous at times, yet so necessary to the administration of justice according to the forms and modes established in our system of government [citing] is subject to mitigation in exceptional circumstances; there is a constitutional exemption from being compelled in any criminal case to be a witness against oneself, entitling the witness to be excused from answering anything that will tend to incriminate him [citing]; some confidential matters are shielded from considerations of policy, and perhaps in other cases for special reasons a witness may be excused from telling all that he knows.

"But, aside from exceptions and qualifications * * * the witness is bound not only to attend but to tell what he knows in answer to questions framed for the purpose of bringing out the truth of the matter under inquiry. * * *

"He is not entitled to set limits to the investigation that the grand jury may conduct. The Fifth Amendment and the statutes relative to the organization of grand juries recognize such a jury as being possessed of the same powers that pertained to its British prototype, and in our system examination of witnesses by a grand jury need not be preceded by a formal charge against a particular

individual. Hale v. Henkel, 201 U.S. 43, 65, 26 S.Ct. 370, 50 L.Ed. 652. It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime. As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning. Hendricks v. United States, 223 U.S. 178, 184, 32 S.Ct. 313, 56 L.Ed. 394."

 Several key points, revelant here, have already been seized by prior decisions and admit little room for controversy. The investigation embarked upon by the January 1955, Grand Jury is a criminal case within the meaning and reach of the Fifth Amendment. United States v. Monia, 1943, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376, Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110. That body was conducting an investigation of possible tax evasion under the Internal Revenue Codes of 1939 and 1954 "in the so-called policy games and other types of gambling." The grand jury subpoena under which Parker testified, comes within the sweep of the constitutional word "compelled." To avail himself of the privilege against self-incrimination a witness is usually required to assert it. Rogers v. United States, 1951, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344. And the privilege will be "deemed waived unless invoked." United States v. Murdock, 1931, 284 U.S. 141, 52 S.Ct. 63, 64, 76 L.Ed. 210. But Parker would avoid the impact of Rogers and Murdock on the grounds that he was the target of the January investigation and should have been forewarned by the prosecutor and advised along the lines of the Fifth Amendment. Any vitality for a requirement that a grand jury witness must be advised of his constitutional rights must flow from notions of fair play and various others attending those circumstances where the prosecutor intends to seek an indictment against the subpoenaed witness. As always the hypothetical academic situation can be simply stated, for example, where the government deliberately subpoenas a witness in order to elicit evidence helpful in indicting him. But one realistic problem arises where the United States Attorney is unable to foresee the vulnerability of a witness. The Second Circuit, when reviewing and refusing to overturn a trial judge's order denying the defense motion to quash an indictment because of testimony obtained before a grand jury from the defendant without warning him of his constitutional privilege against self-incrimination, held in United States v. Scully, 2 Cir., 1955, 225 F.2d 113, 116, that:

"* * * the mere possibility that the witness may later be indicted furnishes no basis for requiring that he be advised of his rights under the Fifth Amendment, when summoned to give testimony before a Grand Jury."

Curiously enough, Scully was already under indictment when he was called before the grand jury. In his concurring opinion Judge Frank observed "that the policy embodied in the privilege against self-incrimination has greater force when a man, already indicted, is called by the prosecutor to testify before a grand jury." 225 F.2d 113, 116.

 "The maxim, 'nemo tenetur seipsum accusare,' " we are taught by Brown v. Walker, 1896, 161 U.S. 591, 596, 16 S.Ct. 644, 646, 40 L.Ed. 819, "had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons, which has long obtained in the continental system, and, until the expulsion of the Stuarts from the British throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, was not uncommon even in England. * * * So deeply did the iniquities of the ancient

system impress themselves upon the minds of the American colonists that the states, with one accord, made a denial of the right to question an accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment." See also: Emery's case, 1871, 107 Mass. 172, 181, for a discussion of the maxim; 8 Wigmore, Evidence § 2250 (3rd ed. 1940) and compare the historical views in Maffie v. United States, 1 Cir., 1954, 209 F.2d 225, 227. But the privilege is aimed at inquiries made to lay bare criminating facts, usually of past matters. Parker's perjury was previously uncommited and his criminal liability concurred with the words he first uttered to the January Grand Jury. The evidence of perjury coincided with the act of testifying in the grand jury room during January, 1955. He was not indicted for any prior perjurious statements, if indeed there ever were any, made before his January appearance in the grand jury room. For that reason we think Parker's perjurious utterances are wholly estranged from the Fifth Amendment privilege he claims was invaded. Mr. Justice Reed, speaking for the majority of a divided court in United States v. Williams, 1951, 341 U.S. 58, 68, 71 S.Ct. 595, 600, 95 L.Ed. 747, evaluated 18 U.S.C. § 1621 involved in the appeal before us, in this fashion:

"Here * * * we have a federal statute enacted in an effort to keep the course of justice free from the pollution of perjury. * * * The effect of the alleged false testimony could not result in a miscarriage of justice in this case but the federal statute against perjury is not directed so much at its effects as at its perpetration; at the probable wrong done the administration of justice by false testimony."

Parker, on the other hand, was not under indictment at the time of his January appearance. The record reveals him as a man of limited formal education— attendance in Chicago public elementary schools through the fourth grade. He did not consult a lawyer prior to his initial testimony before the Grand Jury, nor for all this record shows was he advised by any lawyer as to the giving of his testimony in the presence of the January Grand Jury. Though Parker was a professional bondsman we cannot conjecture how much knowledge he possessed concerning the privilege. Nor do we think our decision need rest on any such flimsy basis.

After all the January Grand Jury was not investigating perjury violations— that was the function of the August, 1955 Grand Jury which returned the indictment now under review. Even if we assume that the newspaper clippings attached to the defendant's motion to dismiss the indictment clearly establish Parker as the target of the January Grand Jury investigation, we are unable to say that his concomitant perjury is eradicated by a failure to warn him of his privilege against self-incrimination. Indeed, legalistically speaking, Parker was neither obliged nor compelled to give testimony which might possibly expose him to the criminal charge of perjury for his act and intent constituting that crime had their genesis in his grand jury room utterances.

Mr. Bates, foreman of the January, 1955 Grand Jury, testified that he administered (see: Rule 6, Federal Rules of Criminal Procedure, 18 U.S.C.) the oath taken by Parker when the defendant first appeared before that Grand Jury. The oath Parker took at the hands of Bates supplied to the foreman "by Judge Barnes' court," was as follows: "You do solemnly swear that in the testimony you are about to give before this Grand Jury you will speak the truth, the whole truth and nothing but the truth, so help you God." Certainly that is a solemn admonition to testify truthfully.

United States v. Bell, C.C.Tenn.1897, 81 F. 830, 841, vigorously urged upon us by the defendant, is an isolated specimen

of what an early court envisaged as basic unfairness. Bell was indicted for perjury, under Rev.St.U.S. § 5392, arising out of an examination before a pension examiner. But the distinguishing factor in that opinion lies in the fact that Bell was a notary public who made a false certificate to a pension certificate filed with the United States Department of the Interior. Bell was acquitted of making that false certificate in December, 1895. A year later the grand jury returned the perjury indictment, under review by the Circuit Court, against Bell based upon his examination before the pension examiner, on November 14, 1895, who reduced Bell's statements to narrative form and to which Bell made oath. Bell apparently testified that "He supposed that the examiner had all the official authority to detain him, and compel him to submit to an examination . . ." The short of it is that Bell certified, as notary, a female deponent had "personally appeared" before him and the government contended she did not—an established fact admitted by defense counsel. While this is a shortened version of the operative facts, it serves as a background for the following reasoning appearing in the court's opinion.

"* * * I have already mentioned that it could hardly have been expected that this defendant, when confronted with an investigation concerning the making of his notarial certificate, should admit that it was false. He might be expected to swear that it was true until at least, as on this trial, its falsity was put beyond all question, for that would be the human tendency of one capable of making a false certificate in the beginning. The examiners probably already knew that it was false, though it does not appear in the evidence here, except by inference, that they had then found out that Hattie Woods was in Missouri, and not in Dorsey's office, when the certificate was made. Why were they not then contented to prosecute on that con-

clusive evidence, as they must have been under Rev.St. § 860, if that applies, since they knew that nothing the defendant would say upon this examination could be used against him for any offense previously committed in respect of his false certificate? Of what value was this examination in view of that section, and to what pending issue did it appertain, or to what was it pertinent? Bell might be used as a witness against Dorsey, no doubt; but he was asked nothing about Dorsey's wrongdoing in the premises, and the examination was confined to Bell's own conduct. His counsel has argued that this shows that the only purpose of this inquisitorial proceeding was to lay the foundation for this indictment for perjury. The examiner denies this, and it is altogether probable that his only purpose was to carry out his instructions, and fully develop the facts for the information of the authorities and prosecutions of offenses. This may relieve the examiner of the imputation of inveigling or leading Bell into the temptation of false swearing, in order to entrap him; but, in its relation to Bell himself, the proceeding was none the less dangerous to him, and its effect on him and his constitutional rights was none the less disastrous because the examiner did not intend to entrap him. He was entrapped as a fact by his own yielding to the temptation to take the bait, and sustain his false certificate, by standing by it with his oath. * * *

"I have no doubt from the proof in this case that the defendant was guilty of making a false certificate, nor that he was guilty afterwards of falsely standing by his false certificate, by the oath that he took before this examiner; and although, in this particular case, the United States lost no money, and the pensioner lost no money, and no particular

harm was done in that regard, I should say for myself that it was a fraudulent proceeding against the United States, by false certificates, to deny to the pension bureau that security which is provided for by requiring a magisterial officer to identify the pensioner at the time of the payment, and otherwise protecting the pension funds against a fraudulent misuse of them; but, having been formerly acquitted by a jury of the offense of making a false certificate, it does not now lie with us to hold the defendant responsible for any offense he committed in that respect, and he now and here stands not only under the ordinary presumption of innocence, but under the sanction of that acquittal, as having committed no such offense. And yet it is sought by this prosecution for perjury substantially to punish him for the same thing, because he subsequently to the making of the false certificate, before the examiner, in one of these inquisitorial examinations, in ignorance of his right to protect himself by silence, has yielded to the temptation to sustain his certificate by swearing that it was true. Heinous as the crime of false swearing is under our law, it is entitled to no other relaxation of the constitutional guaranty of the citizen in order to punish it than any other offense."

It is clear, then, that Bell was a suspect interrogated by the examiner for the purpose of bolstering the prosecution's case. Bell's false certificate precipitated the inquiry producing his incriminating statements. That case is inapposite on its facts and its sweeping dictum irrelevant here. Other than some newspaper stories attached to the defendant's motion to dismiss the indictment, we find this record barren of evidence pointing to Parker as the target for an indictment in January, 1955. Assuming, without deciding that Parker was earmarked for formal accusation by the January Grand Jury, and was indicted by it for tax evasion, policy games and other types of gambling, then the question of whether the failure to warn corroded and infected evidence underlying such indictments would be squarely in issue. But the January, 1955 Grand Jury sought revelation not perpetration. The evidence of perjury was untainted.

■ Parker was admonished to speak the truth. To argue, in substance, that if he had been advised of his constitutional right of silence he would not have perjured himself would be unsound, if not absurd. On the other hand if there was a duty to warn Parker, and the failure so to do treated as fatal error, would result, here in a license to commit perjury. In the setting of this case, based upon the record, we think it insufficiently demonstrated that investigation undertaken by the January, 1955 Grand Jury was aimed at accusing Parker by way of indictment. Consequently it was unnecessary that the federal prosecutors advise him of his constitutional privilege at that time.

United States v. Debrow, 1953, 346 U.S. 374, 376, 74 S.Ct. 113, 115, 98 L.Ed. 92, describes the offense of which Parker was accused and convicted.

"The essential elements of the crime of perjury as defined in 18 U.S.C. § 1621, 18 U.S.C.A. § 1621, are (1) an oath authorized by law of the United States, (2) taken before a competent tribunal, officer or person, and (3) a false statement wilfully made as to facts material to the hearing."

■ Parker focuses one phase of his appeal on the third element, with stress laid upon the requirements of wilfulness and materiality, and there is little, if any, controversy over the first two ingredients of perjury mentioned in the Debrow opinion. Under § 1621 perjury consists of statements of any material matter which the accused "does not believe to be true." Thus perjury "consists in testifying to the truth of a fact

which the accused does not believe to be true; his oath must contradict his belief as to the facts sworn to, for otherwise his oath is not wilfully false." United States v. Remington, 2 Cir., 1951, 191 F.2d 246, 248. Several aspects of the problem before us were summarized by the opinion reported as Young v. United States, 1954, 94 U.S.App.D.C. 54, 212 F.2d 236, 240-241.

"To return a verdict of guilty on a charge of perjury a jury must, of course, be convinced, beyond a reasonable doubt, not only that the accused testified falsely but that he did not, at the time, believe his testimony to be true. The first inquiry in a determination of whether or not the evidence was sufficient for the jury to find an accused guilty of perjury relates to the application of the 'two witness rule.' This rule is misnamed. It does not require the testimony of two witnesses. Properly stated it is that 'the uncorroborated oath of one witness is not enough to establish, for purposes of conviction of perjury, the falsity of sworn testimony' [cases collected]. * * *

"Fulfillment of the two witness rule is necessary for conviction of perjury. It is not, however, sufficient for conviction. An additional requirement is that the jury could reasonably believe that there was no reasonable doubt as to defendant's guilt [citing]. This requirement, of course, relates to both elements of perjury: the falsity of the testimony and the lack of a belief in its truth. Generally, a belief as to the falsity of testimony may be inferred by the jury from proof of the falsity itself * * *." (Footnotes omitted).

■ Materiality of the defendant's utterances heard by the grand jurors is an indispensable element of statutory perjury. "* * * the materiality of what is falsely sworn, when an element in the crime of perjury, is one for the court [cases collected]." Sinclair v.

United States, 1929, 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692. Indeed the Parker jury was instructed by the trial judge: "Whether a statement made by a witness before a Grand Jury is immaterial to the matter then being investigated by the Grand Jury is a question of law to be decided by the trial judge and not by the jury." Immediately thereafter the following instructions were given:

"If you find beyond a reasonable doubt that the Grand Jury inquiry took place as alleged, and that in reply to the questions asked, the defendant made the statements in substance that:

"1). He had not been in New York, New York since 19[4]5, when he was discharged there;

"2). He never met Claude Murphy, but saw him for the first time in 1953 in Luther Rawlings' tavern, and thereafter only spoke with him casually in said tavern on passing on the street, and

"3). He never had anything to do with the police who were on gambling squads with reference to telling them where gambling places were operating, as alleged in the indictment.

"You are instructed, ladies and gentlemen, that the statements would be material to the matter being investigated. The mere possibility that a witness may later be indicted furnishes no basis for requiring that he be advised of his rights under the Fifth Amendment of the Constitution when summoned to give testimony before a Grand Jury."

■ When reviewing a conviction under § 1621, the court in United States v. Moran, 2 Cir., 1952, 194 F.2d 623, 626, pointed out that: "The test of materiality of false testimony is whether the testimony has a natural effect or tendency to influence, impede or dissuade the investigating body from pursuing its in-

vestigation [cases collected]." The opinion in Moran shows that the Congressional Committee was investigating the relationship between public officials and organized crime and "Moran was an official; Weber a convicted gambler. The number of times they met could well have a bearing on the intimacy of their relations, and false statements by Moran as to the frequency of those meetings could thwart or impede the inquiry and prevent disclosure of other facts."

There is absent any relationship between defendant's thesis of the requirement of warning and the materiality of his testimony before the Grand Jury. Parker's statements, under oath, on January 20, 1955, were material to the investigation, but their materiality did not necessitate a warning such as that given him by the Assistant United States Attorney when Parker subsequently appeared before the grand jurors. Mr. Bates, foreman of the grand jury testified, for the government, that on January 20, 1955, "the jury was investigating possible income tax evasion with special emphasis on gambling activities, various gambling activities in the City of Chicago with special emphasis again on policy." Parker's statements, set out in the first and second counts of the indictment, we think, come within the framework of that investigation and were material. United States v. Moran, 2 Cir., 1952, 194 F.2d 623; Blackmon v. United States, 5 Cir., 1940, 108 F.2d 572. Our view that the utterances were material is buttressed by Dolan v. United States, 8 Cir., 1955, 218 F. 2d 454.

Our canvass of this record reveals that the government's proof meets the well-settled standards and principles applicable to prosecutions for perjury. Young v. United States, 1954, 94 U.S.App.D.C. 54, 212 F.2d 236; United States v. Marachowsky, 7 Cir., 1953, 201 F.2d 5.

We leave undiscussed, but not unconsidered, other questions presented on defendant's behalf. Those questions, include *inter alia,* sufficiency of the evidence, conduct of the trial, various rulings on exhibits, reception of evidence and scope of cross-examination. Well briefed as those points were, we found on close analysis that they failed in reaching the status of reversible errors. We conclude that Parker was properly and constitutionally convicted for violating 18 U.S.C. § 1621.

The judgment of conviction brought here for review is affirmed.

Judgment affirmed.