Harry Harold CHERETON, Appellant,

v.

UNITED STATES of America, Appellee.

No. 14172.

United States Court of Appeals Sixth Circuit.

Jan. 30, 1961.

Fred R. Walker, Detroit, Mich., for appellant.

John L. Owen, Asst. U. S. Atty., Detroit, Mich., George E. Woods, Jr., U. S. Atty., Detroit, Mich., on brief, for appellee.

Before McALLISTER, Chief Judge, and MARTIN and WEICK, Circuit Judges.

WEICK, Circuit Judge.

The grand jury returned an indictment against appellant Chereton containing five counts. The first count charged him with a conspiracy with one Raymond Kaufman to use the mails to defraud in violation of Title 18 U.S.C. § 1341. The remaining four counts of the indictment charged Chereton with knowingly and fraudulently making false oaths in relation to the bankruptcy proceeding, In the Matter of Consolidated Radio and Appliance Company, in violation of Title 18 U.S.C. § 152.[1]

The case was tried before a jury in the District Court and at the conclusion of the Government's case, the Court dismissed count one of the indictment which charged the conspiracy to use the mails to defraud. The case was submitted to the jury on the remaining four counts charging the false oaths in the bankruptcy proceeding resulting in Chereton's conviction on all of said counts. He was sentenced to two years imprisonment on each of the four counts to be served concurrently.

In the District Court, Chereton had moved to dismiss the remaining four counts of the indictment on the ground that they did not specifically charge that the alleged false oaths were material to the inquiry in the bankruptcy proceeding. The District Judge denied the motion to dismiss and Chereton claims that this was prejudicial error.

Count two of the indictment is contained in footnote 2.[2] Counts three,

---

1. "Whoever knowingly and fraudulently makes a false oath * * * in or in relation to any bankruptcy proceeding; * * *."

2. "Count Two:
"The grand jury further charges:
"That on or about February 25, 1953, in the Eastern District of Michigan, Southern Division, Harry Harold Chereton, alias Harry H. Chereton, did knowingly and fraudulently make a false oath in relation to the bankruptcy proceeding in the matter of Consolidated Radio and Appliance Company, to-wit:
"'Question: What was the background leading up to this sale of ac-

four and five in the same manner quoted the questions propounded and the answers alleged to be false.

The questions propounded to Chereton, set forth in the several counts of the indictment, in substance elicited information relative to the sale of accounts receivable made by Mid-States Equipment Company, a corporation, to the bankrupt, Consolidated Radio and Appliance Company, to sales of merchandise by Consolidated to Mid-States and to the checks issued by Consolidated purportedly in payment for the merchandise, but which were endorsed by Consolidated and returned to Mid-States.

Chereton controlled Mid-States and his cousin Raymond Kaufman was in control of Consolidated.

At the trial, Kaufman testified that he was advised by Chereton to incorporate

his business as part of a scheme engineered by Chereton to defraud creditors. Pursuant to this plan Mid-States sold $63,469.09 of accounts receivable, claimed to be worthless, to Consolidated for $47,601.82 for which Consolidated gave Mid-States an unsecured promissory note payable on demand. A written agreement was entered into providing for the sale of the accounts receivable. A financial statement of Consolidated was prepared and included the accounts receivable as an asset in the full amount. The agreement, note and financial statement all bear the same date, namely, May 15, 1952. Kaufman testified that Chereton told him that the accounts receivable were worthless. A portion of Kaufman's testimony is in footnote 3.[3]

Kaufman testified that of the merchandise thus obtained from creditors $56,-

counts by your company to the bankrupt?

"'Answer: The only way I can answer that is this: Kaufman knew our business, he knew we were creating a large volume of sales through the direct installment sales business and he has been trying to get into this kind of business for I would say many years; in fact, back three or four or five years ago he wanted to learn this business and he even went to work for one of our branches for a period of three or four months to get some background information of this business. It was back four or five years ago—I am unfamiliar with the date—and he was always asking me for information how to get in this business. It is hard to start your business; the only way you can do is by starting from—making a running start. And we met on numerous occasions, I would say dozens and dozens of times, and he would talk to me, I would talk to him, and out of these conversations the idea was developed that he would buy these receivables.'

"In violation of Section 152, Title 18 U.S.C."

3. "(56) Q. (By Mr. Owen, continuing): Mr. Kaufman, will you please tell the Court and jury, in your own words, in simple language, what was the nature of this scheme and how you were going to effect it, and how you were going to profit from it, and how (57) you were going to conceal your operation, how you were going to avoid detection, if you can?

A. It started out first by incorporating the business. He advised me to incorporate; that I wouldn't be personally liable. Then he proceeded to have a note drawn and made out to the corporation.

"Q. Is this the note which you identified as Exhibit No. 8? A. That is correct.

"Q. Go on. A. And a contract for the sale of the accounts receivable. Then he advised me as to how to make up a statement with these accounts receivable, and how to show an inflated net worth.

"From there, he advised me on what type of merchandise to buy, because he needed a certain type of merchandise in his operation, that I was to send to him.

"He sent a man along with me on several buying trips to advise me as to what type of merchandise to buy, and who to buy it from, and in what amounts to purchase that I would be able to obtain from these people.

"First he would advise me to buy a small amount and to receive the merchandise and then to pay promptly, and then the second time is to always enlarge or double the order, which the creditors wouldn't pay any attention to, in order to keep them from wanting their money, so to speak—in other words, to keep them off our backs, so to speak.

"(58) Did you find these suggestions and this advice effective? A. Yes, I did.

"Q. Did it work? A. Yes, it did.

"Q. Tell the Court and jury why Mr. Chereton went to such great pains and

754.22 in value was shipped to Mid-States and that Chereton paid him personally only $1,000.

Checks of Mid-States payable to Consolidated in the amounts of $18,534.28, $14,479.15 and $9,388.48 in payment for part of the merchandise were endorsed by consolidated and returned to Mid-States and deposited in the bank account of Mid-States on which the checks had been drawn. Not all of the checks had been signed when they were endorsed. There were not sufficient funds in this bank account to pay any of the checks. The checks were credited as payments on this demand promissory note given in connection with the sale of the alleged worthless accounts receivable.

Kaufman further testified that Mid-States shipped Consolidated about $15,000 or $16,000 of merchandise, which had not been ordered and was practically worthless, in order to build up the amount that was owing from Consolidated to Mid-States.

Chereton cites Rudin v. United States, 6 Cir., 1958, 254 F.2d 45, 48 which holds that an indictment must allege all of the elements necessary to constitute a violation of the statute. In that case we held it was not necessary that the indictment follow the exact wording of the statute. Judge Miller, who wrote the opinion of this Court said that "the test of the sufficiency of an indictment is that it must sufficiently apprise the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, that the record show with accuracy to what extent he may plead a former acquittal or conviction." To the same effect is Anderson et al. v. United States, 6 Cir., 1954, 215 F.2d 84, 86.

Chereton relies on Meer v. United States, 10 Cir., 1956, 235 F.2d 65 and United States v. Margolis, 3 Cir., 1943, 138 F.2d 1002.

In Meer, the Court held that materiality was an essential element of an offense charged under Title 18 U.S.C. § 152 although not made so by the statute. The reasoning adopted by the Court was that Congress did not intend to make a false statement in a bankruptcy proceeding an offense where not material to the inquiry or issue presented. In a perjury case, the statute expressly requires that the statement relate to a material matter. Title 18 U.S.C. § 1621. The Court further held that it was necessary for the indictment to either expressly allege that the false statement was material or to set forth sufficient facts to show the materiality.

We would hesitate to hold that an indictment in the exact words of a valid criminal statute was insufficient because it did not contain an element of the offense engrafted thereon by judicial decision. In such a case as the present one, it should be sufficient if the evidence dis-

details to acquaint you with an operation of a business with which you were unfamiliar? A. Primarily, we had no idea of ever running the Consolidated Radio and Appliance as a business of this type. It was strictly an idea to obtain merchandise to be transferred to the Mid-States Equipment Company, where he would dispose of it through his company and return fifty cents on the dollar to me personally, and eventually let the Consolidated go into bankruptcy and wipe the whole thing out.

"Q. This was a scheme to steal, wasn't it? A. That is correct. To defraud the creditors.

"Q. You knew that was what it was when you entered into it? A. That is correct.

"Q. And you say Mr. Chereton knew of this, too? A. He advised me as to every detail.

"Q. Whose idea was it? A. Mr. Chereton's.

"Q. How did Mr. Chereton profit from this scheme? A. The merchandise was shipped to his company. He——

"Q. (Interposing): Merchandise was shipped to his company from (59) whom? A. From Consolidated.

"Q. That was your company? A. That is correct. And he disposed of the merchandise. He gave me the offices and places to ship the merchandise. He had offices throughout the country—various parts of the county—and I would ship the merchandise at his direction in what amounts he wanted to each of his offices."

closed that the question propounded related to a material matter. To us the point seems highly technical because even though materiality was not expressly alleged in the indictment, it clearly appeared from the questions and answers set forth therein that they were material to the inquiry in the bankruptcy proceeding. This is all that the decision in Meer required.

Margolis is authority for the proposition that the false oath must relate to a material matter. It did not involve any question concerning the sufficiency of the indictment.

Chereton states in his brief (p. 17) "No proofs were offered as to the nature of the inquiry then being conducted. Thus, there was nothing before the lower court upon which his ruling could be predicated, that the questions and answers were legally pertinent to the inquiry being conducted." In this, Chereton is in error. The record (Government's Exhibit No. 25) clearly shows that he was being examined in the bankruptcy court in a proceeding under Section 21, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 44, sub. a. This section authorized the bankruptcy court to require any designated person to appear before the court "to be examined concerning the acts, conduct, or property of the bankrupt."

█ Examination of a designated person under this section may be as broad in scope as that permitted of the bankrupt himself. Ulmer v. United States, 6 Cir., 1915, 219 F. 641. The examination is in the nature of a discovery proceeding. It provides the means for a thorough investigation into the affairs of the bankrupt calculated to lead to the discovery and recovery of his assets and a determination of the amount of his indebtedness. The relevancy of questions propounded is not to be determined by standards applied to the trial of issues, but by the broader test of relevancy applied under Rule 26 of the Federal Rules of Civil Procedure, 28 U.S.C. Matter of Autocue Sales & Distributing Corp., D.C.N.Y.1957, 151 F.Supp. 798.

The " * * * trustee may inquire at large and without limit except in cases of plain abuse, to be determined in the Court's discretion." Marx v. Chase National Bank, 2 Cir., 1941, 117 F.2d 800, 801. The inquiry may even be a fishing expedition. In re Foerst, 93 F. 190 (D.C. S.D.N.Y.1899). It is no objection that it leads to the prosecution of an action against the witness. Marx v. Chase National Bank, supra. In proceedings for the reorganization of a corporation under the Bankruptcy Act (11 U.S.C.A. § 501 et seq.) the examination before a master appointed by the Court may be "exploratory and groping; and it may be as searching as to him appears proper." Sachs v. Hadden, 2 Cir., 1949, 173 F.2d 929, 931.

█ These questions set forth in the several counts of the indictment sought to examine Chereton "concerning the acts, conduct, or property of the bankrupt." 11 U.S.C.A. § 44, sub. a. Sufficient facts appear in the questions and answers to establish that they were clearly material to the inquiry. The Trial Judge was right in determining their materiality as a matter of law at the trial. Ulmer v. United States, supra; United States v. Parker, 7 Cir., 1957, 244 F.2d 943, certiorari denied 355 U.S. 836, 78 S.Ct. 61, 2 L.Ed.2d 48. In our judgment, the indictment sufficiently apprised Chereton of what he must be prepared to meet. He could not be brought to trial again for having given the false answers to the questions set forth at length in the indictment. The indictment was, therefore, sufficient. Rudin v. United States, supra.

█ The remaining point to be considered is Chereton's claim that the District Judge assumed the examination of a principal witness and after a question had been answered inquired "What more needs to be said?" Chereton claims that this was prejudicial error.

The witness Davis was a Government witness. He was the receiver and trustee in bankruptcy of Consolidated. He testified on direct examination as to the

efforts made to collect the accounts receivable purchased by Consolidated from Mid-States and the fact that nothing was collected on any of these accounts. Davis had personally sampled about 50 of the accounts and could not find any of the debtors. Some of the addresses were fictitious. Three members of Davis' own staff and two outside individuals attempted to make collections on the accounts without success. He then referred the accounts to a Collection Agency on a 50% contingent basis and no collections were made by the agency. The bankrupt had not made any collections on these accounts subsequent to their purchase.

The District Judge did ask questions of the witness Davis, but, in so doing, we do not believe that he assumed to take over the examination of the witness. The District Judge had a right to ask the questions. His role was more important than that of a mere umpire. Glasser v. United States, 1942, 315 U.S. 60, 82, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Curcio, 2 Cir., 1960, 279 F.2d 681.

The comment made by the Court must be considered in its context with respect to the other questions propounded at the time. The witness was being examined by Government counsel when the Court asked the questions. The Government claims that the comment was directed to it.

We find no error in the questions asked by the Court or in his comment affecting the substantial rights of Chereton. Rule 52(a), Federal Rules of Criminal Procedure, 18 U.S.C.

Furthermore, the Court's instructions to the jury cured any claimed erroneous impression that the comment might otherwise have been made on the jury.[4] There is no claim that the Court's instructions to the jury were erroneous in any respect. A number of the propositions of law covered in the instructions were given by the Court as requested by counsel for Chereton. The verdict is supported by substantial evidence.

The judgment of the District Court is affirmed.

4. "You, as members of this jury, are the exclusive judges of the facts.

"The Court expresses no opinion on the facts of the case, or as to the evidence, nor do I wish you to understand or conclude from anything that I may have said during this trial, or in the course of these instructions at any time that I have intended, either directly or indirectly, to indicate any opinion on my part as to the facts, or as to what I think your findings should be.

"From time to time during the course of the trial the Court asked questions of the witnesses and made comments as to the law in ruling upon objections and motions made by counsel for both sides. You are not to infer from the questions asked by the Court, or such comments that I may have made, that the Court was thereby indicating any opinion as to the evidence or as to what your findings should be. Those questions were asked, and the comments made, in the exercise of the Court's inherent power and its duty to supervise the trial of this particular cause."