Orville L. FREEMAN, Secretary of Agriculture, Appellant,

v.

Charles SELIGSON, Trustee in Bankruptcy of Estate of Ira Haupt & Company, Appellee.

Charles SELIGSON, Trustee in Bankruptcy of Estate of Ira Haupt & Company, Appellant,

v.

Orville L. FREEMAN, Secretary of Agriculture, Appellee.

Nos. 20478, 20482.

United States Court of Appeals District of Columbia Circuit.

Argued March 17, 1967.

Decided June 28, 1968.

---

Miss Kathryn H. Baldwin, Atty., Dept. of Justice, with whom Acting Asst. Atty. Gen., J. William Doolittle and Mr. David G. Bress, U. S. Atty., were on the brief, for appellant in No. 20,478 and appellee in No. 20,482.

Mr. Carl D. Lobell, of the Bar of the Court of Appeals of New York, pro hac vice, by special leave of court, New York City, with whom Mr. Ira M. Millstein, of the Bar of the Court of Appeals of New York, New York City, and Mr. Michael A. Schuchat, Washington, D. C., were on the brief, for appellee in No. 20,478 and appellant in No. 20,482. Mr. Milton M. Gottesman, Washington, D. C., also entered an appearance for appellee in No. 20,478 and appellant in No. 20,482.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBINSON, Circuit Judges.

PER CURIAM:

Judge Robinson files an opinion in Parts I through V of which Chief Judge Bazelon and Judge Leventhal concur.

Judge Leventhal files an opinion in which Chief Judge Bazelon concurs, Judge Robinson dissenting for the reasons stated in Part VI of his opinion. Thus Parts I through V of Judge Robinson's opinion and Judge Leventhal's opinion together constitute the opinion of the court. In No. 20,478, the order appealed from is reversed and the case is remanded to the District Court for proceedings not inconsistent with that opinion. In No. 20,482, the appeal is dismissed as moot.

So ordered.

SPOTTSWOOD W. ROBINSON III, Circuit Judge:

In November, 1963, Ira Haupt & Company[1] sustained huge financial losses in brokerage transactions in cottonseed oil and soybean oil futures on the New York Produce Exchange and the Chicago Board of Trade.[2] Shortly thereafter, it was adjudged a bankrupt in the District Court for the Southern District of New York and a trustee for its estate was appointed. By leave of that court, the trustee instituted an ancillary proceeding[3] in the District Court for the District of Columbia to enable exploratory examinations, pursuant to Section 21(a) of the Bankruptcy Act,[4] of agencies and persons within its jurisdiction.

Under the Commodity Exchange Act,[5] the New York Produce Exchange and the Chicago Board of Trade are designated "contract markets," where contracts for future delivery of certain agricultural products are bought and sold. The continuance of their status as such is conditioned upon compliance with specified requirements, which include considerable

---

1. The bankrupt was a limited partnership, organized under New York law, engaged in a general securities and commodity brokerage and commission business.

2. The bankrupt became liable for customer defaults in meeting margin calls consequent upon price declines, and paid approximately $22,000,000 to the exchanges which, in turn, remitted to short sellers and others who profited on the plunging futures market.

3. Pursuant to Bankruptcy Act § 2(a) (20), 11 U.S.C. § 11(a) (20).

4. 11 U.S.C. § 44(a). The section in pertinent part provides:

"The court may, upon application of any officer, bankrupt, or creditor, by order require any designated persons, including the bankrupt and his or her spouse, to appear before the court or before the judge of any State court, to be examined concerning the acts, conduct, or property of a bankrupt * * *."

5. 49 Stat. 1491 (1936), 7 U.S.C. §§ 1 to 17a.

self-regulation of trading activities.[6] The Secretary of Agriculture is empowered to investigate the operation of contract markets[7] and, by virtue of his rule-making authorities,[8] he requires certain participants to file with the Commodity Exchange Authority of the Department of Agriculture daily reports of their transactions thereon.[9]

The trustee petitioned in the ancillary proceeding for a Section 21(a) examination of the Secretary, alleging a need, in order to delve adequately into the bankrupt's affairs, to inspect documents in the Secretary's custody, access to which had been barred. The purpose of the examination, the petition stated, was to determine whether the bankrupt had a cause of action for the losses it had suffered on the exchanges. The referee in bankruptcy, to whom the ancillary proceeding had been referred, ordered the Secretary's appearance, and the production of documents categorized in a schedule into nineteen separate classifications covering varying periods of time. The demand embraced about a half-million items, including daily reports of trading in cottonseed oil and soybean oil futures, investigative reports of market conditions, and communications between the Commodity Exchange Authority and the exchanges. The trustee also obtained the issuance of a subpoena *duces tecum* commanding the production of the same documents.

The Secretary moved to quash, or alternatively to modify, the subpoena,[10] averring that it was too sweeping in scope and that obedience would sorely burden his agency. He asserted also that the Commodity Exchange Act[11] banned outside scrutiny of many of the documents, and that others were in current use by the Departments of Agriculture and Justice in searches for possible infringements of federal law.

The referee conducted a hearing, after which he denied the motion, expressing his reasons in a written opinion. He acknowledged the existence of limitations on compulsory documentary exhibitions "in connection with judicial hearings in private litigation" but, characterizing the trustee's effort as "not one of litigation, but one of investigation," [12] felt that "the rules should be interpreted with greater liberality than would be the case in matters of litigation." He expressed concern "that, in the conduct of such a far reaching examination of documents, information concerning persons having no connection with the problem would be opened to the trustee or his agents," [13] but concluded that "the material sought, insofar as the individual citizen was concerned, was essentially of a public nature, filed in connection with rules regulating the activity they were engaged in, quite distinguishable from private papers maintained in their personal files." [14]

6. Commodity Exchange Act §§ 5, 5a, 5b, 6(a), 7 U.S.C. §§ 7, 7a, 7b, 8.

7. Commodity Exchange Act § 8, 7 U.S.C. § 12.

8. Commodity Exchange Act § 8a(5), 7 U.S.C. § 12a(5).

9. 17 C.F.R. pts. 15 to 18 (1964 ed.).

10. Throughout the litigation the parties seem to have concentrated on the subpoena to virtual exclusion of the referee's order, the import of which was identical. We, too, find it necessary to treat only the subpoena since the disposition of either affects both equally.

11. Commodity Exchange Act § 8, 7 U.S.C. § 12.

12. The referee stated elsewhere "[t]hat this is an investigatory proceeding and not an adversary proceeding."

13. In his findings, the referee stated "[t]hat if there be any records or documents that, when under oath, the witness testifies have no relation to, or connection with, the bankrupt, that record or document shall be shown to the Court for its determination of availability to the trustee in bankruptcy."

14. Compare another finding of the referee: "That the records under order and subpoena to produce are not confidential records and documents related to the private business of the party under subpoena or of any other party, but are, in fact, public records filed as required by law by persons obligated to make such disclosures in order to engage in the business or activity involved, or documents prepared by the regulating agency in connection therewith, of which the witness is the custodial respository."

Countering the suggestion that response to the subpoena might involve disclosure of trade secrets, the referee stated that "whatever trade secrets might be divulged by the examination of the documents under order to be produced have now so mellowed with age by the passage of time that they can be of little importance." And noting that "[t]he subpoena is broad and sweeping in its scope," he opined that "[i]t has to be because of the subjects under consideration. But by subject matter it is as limited as it can possibly be." He added that "[t]he fact that a great number of documents are involved is indicative of the fact that a great number of documents were required by the government to regulate and 'police' the market. If it was necessary for the government to accumulate these documents in this endeavor, then it is necessary for the trustee to have access to them in order to fulfill his duties."

▮▮▮ The Secretary filed a timely petition for review.[15] After a hearing, the District Court entered its order which, as finalized, denied the petition[16] "without prejudice to petitioner's contention herein."[17] The Secretary noted an appeal,[18] and the trustee cross-appealed.[19]

We reverse and remand the case to the District Court for reconsideration, and utilize this opportunity to delineate the legal principles which the court should then observe. In Part I we discuss the nature and scope of Section 21(a) exam-

---

**15.** Pursuant to Bankruptcy Act § 39(c), 11 U.S.C. § 67(c).

**16.** Since there was no opinion, oral or written, we have only the District Judge's remarks at the hearing to elucidate the ruling. We are clear, however, that the only aspect of the referee's decision which was altered pertained to assertions of privilege. See note 17, *infra*.

**17.** Two orders were entered. The first, later vacated, did not contain the language of the second, which is quoted in the text.

While the referee in effect denied all claims of privilege advanced by the Secretary, the District Judge, at the hearing on the petition to review, made it clear that privileged documents need not be produced. There then followed extensive colloquy as to whether issues as to privilege were to be decided in the Section 21(a) proceeding or in contempt proceedings following nonproduction. We take the language added to the second order to preserve, very correctly, the Secretary's prerogative to assert claims of privilege as to particular items in the Section 21(a) proceeding itself. See note 63, *infra*, and accompanying text.

**18.** Our authority to entertain these appeals flows from the Bankruptcy Act, § 24(a), 11 U.S.C. § 47(a), conferring "appellate jurisdiction * * * in proceedings in bankruptcy, either interlocutory or final," and differentiating our power "in controversies arising in proceedings in bankruptcy," where finality of the order to be reviewed is prerequisite. See 2 Collier, Bankruptcy §§ 24.04, 24.12, 24.16 (14th ed. 1966). "Discovery matters are of an administrative character. They are not actions within the bankruptcy action affecting title to a bankrupt's estate, appealable only when a final order has been entered. They are 'proceedings' in bankruptcy * * *." Henry Ansbacher & Co. v. Kelbanow, 362 F.2d 569, 570 (2d Cir. 1966). See also In re Equitable Plan Co., 272 F.2d 158, 159 (2d Cir. 1959); In re Bush Terminal Co., 105 F.2d 156, 157 (2d Cir. 1939); In re Winton Shirt Corp., 104 F.2d 777, 779–780 (3d Cir. 1939).

Section 24(a) further provides, however, "[t]hat when any order, decree or judgment involves less than $500, an appeal therefrom may be taken only upon allowance of the appellate court." This proviso is inapplicable here since the order appealed from has no direct monetary involvement. Robertson v. Berger, 102 F.2d 530, 531 (2d Cir. 1939); In re Winton Shirt Co., *supra*. See also Mario Mercado E. Hijos v. Feliciano, 260 F.2d 500, 502 (1st Cir. 1958).

**19.** The trustee has no objection to the District Court's order if the "without prejudice" clause means only that the Secretary may hereafter press unlitigated claims of privilege with reference to particular documents. In other words, the trustee's appeal is simply an effort to safeguard against the possibility that the order leaves the Secretary free to relitigate matters drawn into controversy before and resolved by the referee. Our disposition removes any dilemma in this respect.

inations and their relationship to the discovery provisions of the Federal Rules of Civil Procedure. In Part II we consider the problem of relevance, in Part III the requirement of good cause, and in Part IV the burden of response incidental to the trustee's subpoena. In Part V we deal with a miscellaneous group of privileges the Secretary intends to invoke. Judge Leventhal's opinion delineates the applicability and effect of provisions of the Commodity Exchange Act upon the production sought, matters upon which I state my views in Part VI of this opinion.

## I

■ A trustee in bankruptcy by operation of law is invested with title to the bulk of the bankrupt's nonexempt property,[20] including transferable or leviable causes of action.[21] He is under a duty to maximize the realization on liquidation of the estate, and to this end to institute all necessary litigation.[22] Fulfillment of these responsibilities obviously entails careful exploration into the bankrupt's affairs with a view to discovery and recovery of assets.

■ Section 21(a) of the Bankruptcy Act is designed to facilitate efforts in that direction. It authorizes examination of "any designated persons * * * concerning the acts, conduct, or property of a bankrupt,"[23] and within this limitation the latitude for investigation is wide. "The inquiry may even be a fishing examination;"[24] it may be "exploratory and groping."[25] Broadly speaking, the examination of a third person may be as comprehensive as that permitted of the bankrupt himself.[26]

We do not, however, share the referee's view that Section 21(a) examinations are occasions for relaxation of the prerequisites to discovery in civil actions generally. While the Civil Rules are in terms applicable to bankruptcy proceedings only to the extent made so by the Supreme Court,[27] the Bankruptcy Act, with a proviso immaterial here, confers "[i]n all proceedings under this title" upon interested parties "all rights and remedies granted" by the Civil Rules "pertaining to discovery" and "inspection and production of documents."[28] And the gen-

---

20. Bankruptcy Act § 70(a), 11 U.S.C. § 110(a). See generally 4 Collier, Bankruptcy §§ 70.07, 70.10 *et seq.* (14th ed. 1966).

21. The trustee acquires the bankrupt's title to "property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded or sequestered: * * *" Bankruptcy Act § 70(a) (5), 11 U.S.C. § 110(a) (5). See 4 Collier, Bankruptcy §§ 70.28, 70.29 (14th ed. 1966).

22. See Bankruptcy Act § 47(a) (1), 11 U.S.C. § 75(a) (1); Palmer v. Travelers Ins. Co., 319 F.2d 296 (5th Cir. 1963); 2 Collier, Bankruptcy §§ 47.04, 47.05 (14th ed. 1966).

23. Bankruptcy Act § 21(a), 11 U.S.C. § 44(a), quoted in part *supra* note 4.

24. Chereton v. United States, 286 F.2d 409, 413 (6th Cir.), cert. denied 366 U.S. 924, 81 S.Ct. 1351, 6 L.Ed.2d 584 (1961). See also In re Autocue Sales & Distrib. Corp., 151 F.Supp. 798, 800 (S.D.N.Y. 1957).

25. Sachs v. Hadden, 173 F.2d 929, 931 (2d Cir. 1949).

26. Chereton v. United States, *supra* note 24, 286 F.2d at 413.

27. "These rules * * * do not apply to proceedings in bankruptcy * * *, except in so far as they may be made applicable thereto by rules promulgated by the Supreme Court of the United States." F.R.Civ.P. 81(a) (1).

28. "In all proceedings under this title, the parties in interest shall be entitled to all rights and remedies granted by the Rules of Civil Procedure for the United States District Courts established from time to time by the Supreme Court pertaining to discovery, interrogatories, inspection and production of documents, and to the admission of execution and genuineness of instruments: * * *." Bankruptcy Act § 21(k), 11 U.S.C. § 44(k). And in similar vein, "[e]xcept as herein otherwise provided, the right to take depositions in proceedings under this title shall be determined and enjoyed according to the laws of the United States now in force, or such as may be hereafter enacted, relating to the taking of depositions." Bankruptcy Act § 21(b), 11 U.S.C. § 44(b).

eral orders in bankruptcy promulgated by the Supreme Court provide broadly that "[i]n proceedings under the Act" the Civil Rules "shall * * * be followed as nearly as may be," and more specifically that "[t]he examination of witnesses before the referee * * * shall be governed" by the Civil Rules, in each instance "in so far as they are not inconsistent with the Act or with these general orders." [29]

Perceiving no such discordance,[30] we cannot attach controlling significance to the distinction the referee drew between matters "of investigation" in bankruptcy proceedings and those "of litigation" in other judicial contests.[31] It is clear to us that the Section 21(a) examination is a bankruptcy equivalent of civil pretrial discovery, and that to each the same restrictions on compelled documentary productions obtain, their application varying the result only as demanded by the nature of the proceeding and the circumstances of the particular case.[32]

We agree that "[i]n determining the reasonableness of the requirements of a challenged subpoena the court is called upon to balance the important function of the trustee to expose chicanery and double-dealing against the incalculably precious right of the citizen to be let alone, and to hold his writings inviolate from alien eyes in the absence of evidence that the material sought is relevant to the bankrupt's acts or property, and that, under the law, there is justification for the invasion of the individual's treasured privacy." [33]

In the quite recent past, we outlined the general judicial approach to disposition of a motion to quash or modify a subpoena *duces tecum* employed for civil pretrial discovery—an approach which, for the reasons stated, we think discovery in bankruptcy proceedings equally requires. In Boeing Airplane Co. v. Coggeshall,[34] we summarized the interrelationship of the several pertinent Civil Rules[35] and concluded that "if the documents

---

29. "The examination of witnesses before the referee * * * shall be governed by the Rules of Civil Procedure for the District Courts of the United States, in so far as they are not inconsistent with the Act or with these general orders." General Order 22.

"In proceedings under the Act the Rules of Civil Procedure for the District Courts of the United States shall, in so far as they are not inconsistent with the Act or with these general orders, be followed as nearly as may be. * * * *" General Order 37.

30. See Georgia Jewelers, Inc. v. Bulova Watch Co., 302 F.2d 362, 368 (5th Cir. 1962). See also the cases cited *infra* notes 31 and 32.

31. See Elias v. Clarke, 143 F.2d 640, 644 (2d Cir. 1944), cert. denied 323 U.S. 778, 65 S.Ct. 191, 89 L.Ed. 622 (1944); Moonblatt v. Kosmin, 139 F.2d 412, 414 (3d Cir. 1943); Georgia Jewelers, Inc. v. Bulova Watch Co., *supra* note 30, 302 F.2d at 367–368; In re Cesari, 217 F.2d 424, 427 (7th Cir. 1954); Claybrook Drilling Co. v. Divanco, Inc., 336 F.2d 697, 700 (10th Cir. 1964).

32. See Herron v. Blackford, 264 F.2d 723, 725 (5th Cir. 1959); Chereton v. United States, *supra* note 24, 286 F.2d at 413; In re Autocue Sales & Distrib. Corp., *supra* note 24, 151 F.Supp. at 800.

33. Herron v. Blackford, *supra* note 32, 264 F.2d at 725.

34. 108 U.S.App.D.C. 106, 280 F.2d 654 (1960).

35. "In particular, Rules 26(b), 30(b), and 45(b) and (d) are controlling. These rules must be read in *pari materia*. [Citations omitted]. Rules 45(d) and 26(b) establish the outer limits of enforcement. Rule 45(d) permits a subpoena to order any person to produce papers 'which constitute or contain evidence relating to any of the matters within the scope of the examination permitted by Rule 26(b), but in that event the subpoena will be subject to the provisions of subdivision (b) of Rule 30 and subdivision (b) of this Rule 45.' Rule 26(b) permits the discovery of 'any matter, not privileged, which is relevant to the subject matter involved in the pending action,' but is also limited by Rule 30(b).

"Rules 30(b) and 45(b) impose the following restrictions on enforcement under Rules 45(d) and 26(b): Rule 30(b) confers broad power on the court, 'for good cause shown,' to afford relief from a subpoena 'which justice requires to protect the party or witness [under subpoena] from annoyance, embarrassment, or oppression.' Rule 45(b) authorizes the District Court to 'quash or

under subpoena \* \* \* are relevant to the subject matter of the" proceeding for which their production is sought, "the subpoena should be enforced on a showing of good cause unless the documents are privileged or the subpoena is unreasonable, oppressive, annoying, or embarrassing." [36] And "[i]f the District Court believes the subpoena has a meritorious basis but should not be enforced as drafted," we said, "it has authority under Rule 30(b) to modify the subpoena and impose such conditions on enforcement as justice may require." [37] With these considerations as the polestar guiding our review, we now proceed to a canvass of the record in this case in order to ascertain whether the techniques employed in the District Court can pass muster.

## II

We believe that beyond cavil most, perhaps all, of the materials the subpoena encompassed satisfied the standard by which their relevance for purposes of production is to be determined.[38] Under Section 21(a), we reemphasize, the trustee was licensed to examine third parties "concerning the acts, conduct, or property of" the bankrupt,[39] a process which by its very nature is a vehicle for broad discovery.[40] And "[u]nder Rule 26(b) relevancy," for purposes of discovery, "is defined in terms of the likelihood that useful evidence may be uncovered. Since Rule 45(d) specifically incorporates this standard, the court need not consider whether or not the papers, themselves, would be admissible

in evidence." [41] Here the trustee's objective was inquiry calculated to disclose whether and against whom a cause of action may exist on account of market operations inducing the bankrupt's financial descent,[42] and we cannot say that the prospect of "useful evidence" nowhere inheres in the data the Secretary possesses.

The trustee has theorized the connection between the papers the subpoena demands and the litigation he envisions as a potential. The daily reports, revealing the daily trades and positions of reporting firms, not only would identify traders but would also shed light on the manner in which trading was conducted during pertinent periods and whether any provisions of law were violated. Information transmitted by the Commodity Exchange Authority on market transactions and positions would promote insight into whether the exchanges properly discharged their obligations to regulate the markets. Information possessed by commodity traders and brokers would reflect on the propriety of their activities. Source materials the Secretary obtained through investigation of exchange operations and transactions thereon, and information as to prior regulatory failures and legal violations by dealers and operators, would provide the setting in which the bankrupt's downfall might be viewed in determining whether the actions taken were reasonable and the regulatory functions adequately discharged. Of course, we do not say that all of these materials had to be opened to the trustee's perusal,

modify the subpoena if it is unreasonable and oppressive.'" 108 U.S.App. D.C. at 110–111, 280 F.2d at 658–659.

36. *Id.* at 111, 280 F.2d at 659.

37. *Ibid.*

38. Indeed, counsel for the Secretary stated during the hearing on the petition for review that "probably three or four thousand documents" had already been made available to the trustee.

39. See *supra* note 4.

40. Frequently, however, no specific issues are or can be made up when the Section 21(a) examination occurs. In this re-

spect it differs from discovery in ordinary civil lawsuits.

41. Boeing Airplane Co. v. Coggeshall, *supra* note 34, 108 U.S.App.D.C. at 111, 280 F.2d at 659. See also Chereton v. United States, *supra* note 24, 286 F.2d at 413; In re Autocue Sales & Distrib. Corp., *supra* note 24, 151 F.Supp. at 800.

42. In his petition the trustee alleged that the examination was essential to ascertainment of whether a cause of action existed. During the hearing before the referee, his counsel stated that undoubtedly it did exist and that the question was against whom.

for the disclosure of at least some is affected by other considerations. We do say, however, that viewing solely their relevance, many have met amply the test.

Section 21(a), however, is in one respect self-restricting. Only when relevant and material to the bankrupt's "acts, conduct or property" can either testimonial interrogation[43] or compulsory documentary production be tolerated. The bare possibility that *some* unidentified participants in the commodities futures markets may somehow have wronged the bankrupt would not make the activities of *all* the legitimate concern of the trustee. And it is evident from the immensity of the subpoena's call that materials completely foreign to the bankrupt's operations may indeed have been included, a view, we gather, the Secretary shares. This, of course, is a matter for judicial consideration and determination,[44] and the referee's order provides for separation from the great mass demanded of documents which do not meet this criterion.[45] Thus, any production responsive to the subpoena will be kept within the limits the Act sets.

### III

That documents meet the requirement of relevance does not alone demonstrate that there is good cause for requiring their production.[46] "And the burden of showing good cause is an affirmative one in that it is not satisfied merely by a showing that justice would not be impeded by production of the documents."[47] But " '[g]ood cause' may ordinarily be sustained by a claim that the requested documents are necessary to establishment of the moving party's claim or that denial of production would cause the moving party 'undue hardship or injustice.' "[48] We are impressed by the trustee's argument that such was the case here, but several circumstances give us reason to pause.

The referee found that the subpoenaed documents were "proper and essential to the investigation being undertaken by the trustee" and "[t]hat the records and documents in the possession, custody and control of the Secretary of Agriculture must be made available to the trustee in bankruptcy in order for him to properly perform his obligations under the bankruptcy [sic] Act." Ordinarily this would have put the matter suitably to rest, but here we cannot be sure. The Secretary informs us that some of the items requested are already available to the trustee as public records;[49] and we are unable to tell what, if any, consideration was given to possible resort to other sources for at least some of the material. From what does appear, many of the documents sought are exclusively under the Secretary's control, and others are obtainable from third parties, if at all, only at great inconvenience. But we think that, particularly with so large a demand as the subpoena here makes, a determination on good cause requires that all reasonable alternatives be explored.[50]

43. See In re Youroveta Home & Foreign Trade Co., 288 F. 507, 513–514 (2d Cir. 1923); In re Fox, 96 F.2d 23, 26 (3d Cir. 1938); Herron v. Blackford, *supra* note 32, 264 F.2d at 725.

44. See Herron v. Blackford, *supra* note 32, 264 F.2d at 725; In re Fixen & Co., 96 F. 748, 755 (S.D.Cal.1899).

45. See note 13, *supra* and accompanying text.

46. Schlagenhauf v. Holder, 379 U.S. 104, 118, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964). See also Boeing Airplane Co. v. Coggeshall, *supra* note 34, 108 U.S.App. D.C. at 111, 280 F.2d at 659.

47. Boeing Airplane Co. v. Coggeshall, *supra* note 34, 108 U.S.App.D.C. at 111, 280 F.2d at 659.

48. *Ibid.*, quoting 4 Moore, Federal Practice ¶ 34.08 (2d ed. 1966).

49. Into this category falls information concerning the activities of persons who, in proceedings under the Commodity Exchange Act, are "found guilty" of violating its provisions. See Commodity Exchange Act § 8, 7 U.S.C. § 12.

50. See Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); United States v. Five Cases, 9 F.R.D. 81 (D.Conn.1949), aff'd 179 F.2d 519 (2d Cir.), cert. denied 339 U.S. 963, 70

After the hearing before the referee, but shortly before he rendered his decision, the trustee filed an action in the Southern District of New York to recover for losses sustained by the bankrupt on that commodity market and for treble damages on an antitrust count. The mere fact that the Section 21(a) examination has as one of its aims discovery which could aid the prosecution of that suit does not affect the legitimacy of continued inquiry.[51] And we recognize that to the extent that the examination seeks information relating to events in soybean oil futures on the Chicago Board of Trade, no amount of discovery in the pending litigation, confined as it is to dealings in cottonseed oil futures on the New York Produce Exchange, is likely to substitute adequately. But to the extent that the trustee is able to conveniently obtain from his New York adversaries information identical to that sought by the subpoena, good cause for the request made here is lacking.[52]

We deem these difficulties sufficiently grave as to themselves require that this case be sent back to the District Court for reconsideration of the matter of good cause in the light of the principles and problems we have discussed.

### IV

The Secretary presses vigorously the contention that the subpoena is so broad as to be unreasonable and oppressive, and for support points to a number of uncontradicted circumstances. About a half-million documents are sought. A search of at least six major agencies of the Department of Agriculture will be required. These agencies operate independently and maintain separate records, and within a particular agency the data may be in its Washington office or its field offices, or it may be stored in the various federal record centers distributed over the country. Compliance with the subpoena will require of the Commodity Exchange Authority alone an estimated 724 manpower hours and an expense of about $3,500. The Department's Inspector General anticipates that a minimum of three months, with a time expenditure equivalent to one man-year and a cost ranging between $10,000 and $15,000, will be needed to locate and to review, for possible assertion of privilege, the items in his custody. This work would entail the use of personnel in relatively high positions of responsibility, with resultant impediment of other operations.

Nonetheless, the Secretary's undertaking on this facet of the case is difficult. We have said that "[t]he burden of proving that a subpoena *duces tecum* is oppressive is on the party moving for relief on this ground,"[53] and that "[t]he burden is particularly heavy to support a 'motion to quash as contrasted to some more limited protection.' "[54] We hesitate to say that the trustee's demand is oppressive on its face,[55] and "[e]ven though the subpoena is addressed to a non-party, inconvenience occasioned by compliance with the subpoena is not a sufficient reason to quash."[56] Moreover, "the paramount interests of the Government in having justice done between litigants in the Federal courts militates in favor of requiring a great effort on its part to pro-

S.Ct. 997, 94 L.Ed. 1372 (1950); Thompson v. Hoitsma, 19 F.R.D. 112 (D.N.J. 1956).

51. In re Paramount Publix Corp., 82 F.2d 230, 233–234 (2d Cir. 1936); In re Cliffe, 97 F. 540, 542 (E.D.Pa.1899).

52. See the cases cited *supra* note 51. See generally 4 Moore, Federal Practice ¶ 34.08 (2d ed. 1966).

53. Westinghouse Elec. Corp. v. City of Burlington, 122 U.S.App.D.C. 65, 69, 351 F.2d 762, 766 (1965). See also Boeing Airplane Co. v. Coggeshall, *supra* note 34, 108 U.S.App.D.C. at 111, 280 F.2d at 659.

54. Westinghouse Elec. Corp. v. City of Burlington, *supra* note 53, 122 U.S.App. D.C. at 69, 351 F.2d at 766.

55. Compare Boeing Airplane Co. v. Coggeshall, *supra* note 34, 108 U.S.App.D.C. at 111, 280 F.2d at 659.

56. Westinghouse Elec. Corp. v. City of Burlington, *supra* note 53, 122 U.S.App. D.C. at 70, 351 F.2d at 767.

duce any documents relevant to a fair termination of this litigation."[57]

There are, too, weighty considerations on the trustee's side of the issue. His investigation must necessarily be outspread, and the litigation it would assist is important; on it may hinge the salvation of the bankrupt's estate. The trustee has offered to conduct his examination of the documents at the various locations at which they may be found, and he tells us that he seeks only the opportunity of inspection, and not the privilege of copying the documents. He has also offered to pay all expenses incurred.[58]

The referee concluded "[t]hat weighed against the problem confronting the trustee in bankruptcy the order and the subpoena are not burdensome or oppressive and are not too broad or sweeping in their scope, but to the contrary are as limited as could be under the circumstances." But in pondering the verity of this finding, we are plagued by uncertainty as to whether it was infected by his "greater liberality" standard.[59] We are also disturbed by his reasoning that because the Secretary has to have the documents in order "to regulate and 'police'" commodity markets, "then it is necessary for the trustee to have access to them in order to fulfill his duties."[60] The Secretary polices the markets to guard against evils other than price manipulations and corners, and the trustee asserts no need for disclosure of information pertaining to other types of forbidden activity.

Here, as elsewhere, our doubts cause us to order reconsideration on the remand of this case, which in any event must occur. This problem, as others, must be resolved through an application of proper criteria to the circumstances supported by the record.[61]

## V

Although the Secretary contends that the bulk of the documents subpoenaed are protected by a privilege of one kind or another, there has, as yet, been no formal claim of privilege.[62] We agree, however, with the Secretary that matters of privilege can appropriately be deferred for definitive ruling until after the production demand has been adequately bolstered by a general showing of relevance and good cause, and at least the rough dimensions of the Secretary's burden have been set.[63] This technique may, as to particular items, eliminate a "showdown" on privilege.[64] Perhaps also the frequently, and in this case almost certain, laborious page-by-page examination which assertions of

57. *Ibid.* We have said similarly that "the traditional function of the courts in such a situation [is] to see that the fullest possible evidence, consistent with any privilege which the Government could properly claim, was made available for the proper decision of the controversy." Wirtz v. Baldor Elec. Co., 119 U.S.App. D.C. 122, 133, 337 F.2d 518, 529 (1963).

58. Compare Westinghouse Elec. Corp. v. City of Burlington, *supra* note 53, 122 U.S.App.D.C. at 70, 351 F.2d at 767.

59. *Supra*, p. 4.

60. *Supra*, p. 5.

61. The problem need not be approached or resolved on an all-or-nothing basis. The District Court has ample discretion to order production in a modified form. It may also direct a preliminary partial search to ascertain "how productive and how onerous a search of the complete file would be." Westinghouse Elec.

Corp. v. City of Burlington, *supra* note 53, 122 U.S.App.D.C. at 70, 351 F.2d at 767.

62. As the Secretary points out, it cannot be known exactly which of the documents in certain categories are proper subjects of a claim of privilege until they have been reviewed in detail.

63. See United States v. Reynolds, 345 U.S. 1, 10–11, 73 S.Ct. 528, 97 L.Ed. 727 (1953); Westinghouse Elec. Corp. v. City of Burlington, *supra* note 53, 122 U.S. App.D.C. at 73, 351 F.2d at 770; Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, 40 F.R.D. 318, 330 n. 50 (D.D.C. 1966), aff'd sub nom. V. E. B. Carl Zeiss, Jena v. Clark, 128 U.S.App.D.C. 10, 384 F.2d 979, cert. denied 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967).

64. United States v. Reynolds, *supra* note 63, 345 U.S. at 11, 73 S.Ct. 528.

privilege will require, certainly of the Secretary and perhaps also of the court,[65] may be avoided or curtailed.

We are, however, on notice that privileges of certain types will be asserted, and it is evident that the rulings to be made could drastically affect the size and nature of any production to be made. We think that, in the circumstances of this case, we should lay down general guidelines in this regard, leaving determinations as to specific documents for such time as the issue develops precisely.

■ Affidavits furnished by the Secretary assert that many of the papers sought, including importantly those in the Department's investigative files, contain intra- and inter-agency advisory opinions and recommendations submitted for consideration in the performance of decision- and policy-making functions. This claim, if appropriately advanced and supported, would preclude disclosure of these documents. In Boeing Airplane Co. v. Coggeshall,[66] we held that recom-

mendations as to Renegotiation Board decisions and policies were protected against normal production requirements. Later, in Machin v. Zuckert,[67] we held similarly that memoranda reflecting recommendations and deliberations on Air Force policy were immune from revelation. Still more recently, V. E. B. Carl Zeiss, Jena v. Clark[68] affirmed without opinion a ruling that "the privilege obtains with respect to intragovernmental documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."[69] These decisions have, since the District Court's holdings in this case, been fortified by a clear expression of congressional policy to hold the line on disclosure of materials of this sort.[70]

■ The affidavits also inform us that other materials, many associated with agency investigations, contain information supplied in the understanding that it would be kept confidential. They

65. The court may become so involved because we have adopted the *in camera* inspection as the procedure for accommodating claims of privilege where no military or diplomatic secrets are involved. Westinghouse Elec. Corp. v. City of Burlington, *supra* note 53, 122 U.S.App. D.C. at 73, 351 F.2d at 770; Machin v. Zuckert, 114 U.S.App.D.C. 335, 340, 316 F.2d 336, 341, cert. denied 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963); Boeing Airplane Co. v. Coggeshall, *supra* note 34, 108 U.S.App.D.C. at 114, 280 F.2d at 662.

66. *Supra* note 34, 108 U.S.App.D.C. at 112, 280 F.2d at 660.

67. *Supra* note 65, 114 U.S.App.D.C. at 338, 316 F.2d at 339.

68. *Supra* note 63, 128 U.S.App.D.C. 10, 384 F.2d at 979.

69. Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, *supra* note 63.

70. Pub.L. 89–487, 80 Stat. 250 (1966), effective July 4, 1967, as incorporated by Pub.L. 90–23, 81 Stat. 54 (1967), into 5 U.S.C. § 552, is designed "to provide a true Federal public records statute by requiring the availability, to any member of the public, of all of the executive branch records described in its requirements," with nine stated exemptions.

H.R. Rep. No. 1497, 89th Cong., 2d Sess. 1 (1966), U.S.Code Cong. & Admin.News, 1966, p. 2418. While inapplicable to this litigation, the history of this legislation reflects current congressional policy regarding public access to governmental records.

Within one exemption are "[i]nter-agency or intra-agency memorandums or letters which would not be available by law to a private party in litigation with the agency." 5 U.S.C. § 552(b) (5). As the House report points out, "[a]gency witnesses argued that a full and frank exchange of opinions would be impossible .if all internal communications were made public. They contended, and with merit, that advice from staff assistants and the exchange of ideas among agency personnel would not be completely frank if they were forced to 'operate in a fishbowl.' Moreover, a Government agency cannot always operate effectively if it is required to disclose documents or information which it has received or generated before it completes the process of awarding a contract or issuing an order, decision or regulation." H.R. Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966), U.S.Code Cong. & Admin.News, 1966, p. 2427. See also S. Rep. No. 813, 89th Cong., 2d Sess. 9 (1965).

show that in the many cases where the agency lacks subpoena power, the success of the investigation depends upon its ability to obtain the informant's voluntary cooperation. They assert that an identification of informational sources would seriously impair the effectiveness of the investigative function. They voice fears of economic reprisals, and even of lawsuits, against the informants should the seal of secrecy be broken. This contention, we think, necessitates "a new balance between the need of litigants for information possessed by the Government and the need of the Government to foster the flow of information provided to it." [71] It will likewise require the District Court, "[i]n considering the documents or classes of documents claimed to be [so] privileged, * * * [to] weigh their relevance to possible defenses, the seriousness of this litigation, the possible significance of the informer's information, and other relevant factors." [72]

The Secretary's affidavits also state that some of the documents requested are under study by the Department of Justice with a view to possible criminal or civil actions by the Government. To the extent to which this is so, they must be excluded from the production.[73] Additionally, it is said that some of the materials within the apparent scope of the subpoena are the work papers of attorneys in the Departments of Agriculture and Justice pertaining to potential litigation by the Government before administrative agencies or the courts. While an objection that an item is an attorney's work product does not rest strictly on privilege,[74] this assertion will bear careful scrutiny in the application of the principles governing accessibility to documents of this character.[75]

## VI

We come now to the Secretary's claim that the bulk of the material the subpoena solicits occupies a privileged status conferred by Section 8 of the Commodity Exchange Act.[76] That section in pertinent part provides:

"For the efficient execution of the provisions of this chapter, and in order to provide information for the use of Congress, the Secretary of Agriculture may make such investigations as he may deem necessary to ascertain the facts regarding the operations of boards of trade and other persons subject to any of the provisions of this chapter, whether prior or subsequent to the enactment of this chapter, and may publish from time to time, in his discretion, the

---

71. Westinghouse Elec. Corp. v. City of Burlington, *supra* note 53, 122 U.S.App. D.C. at 72, 351 F.2d at 769. See also Machin v. Zuckert, *supra* note 65, 114 U.S.App.D.C. at 338, 316 F.2d at 339.

72. Westinghouse Elec. Corp. v. City of Burlington, *supra* note 53, 122 U.S.App. D.C. at 74, 351 F.2d at 771.

73. Capitol Vending Co. v. Baker, 35 F.R. D. 510 (D.D.C.1964).

The new statute governing public access to governmental records, see note 70, *supra*, exempts "investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency." 5 U.S.C. § 552(b) (7). The House Report explains that "[t]his exemption covers investigatory files related to enforcement of all kinds of laws, labor and securities laws as well as criminal laws. This would include files prepared in connection with related Government litigation and adjudicative proceedings. [The statute] is not intended to give a private party indirectly any earlier or greater access to investigatory files than he would have directly in such litigation or proceedings." H.R.Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966), U.S.Code Cong. & Admin.News 1966, p. 2428. See also S.Rep. No. 813, 89th Cong., 2d Sess. 9 (1965).

74. Hickman v. Taylor, *supra* note 50, 329 U.S. at 508, 67 S.Ct. 385.

75. The procedure appropriate for determination of claims which involve privilege is of course adaptable to those which, strictly speaking, do not. See Boeing Airplane Corp. v. Coggeshall, *supra* note 34, 108 U.S.App.D.C. at 114, 280 F.2d at 662.

76. 7 U.S.C. § 12, as amended by Pub.L. 90–258, § 19(b), 82 Stat. 26 (1968).

result of such investigation and such statistical information gathered therefrom as he may deem of interest to the public, *except data and information which would separately disclose the business transactions of any person and trade secrets or names of customers: * * *.*" (Emphasis supplied).

As we have stated, the Secretary exercises his investigatory power in part by requiring the filing of daily reports of transactions on the commodity markets.[77] From uncontroverted affidavits he has furnished, it appears that the vast majority of the sought after documents, falling within nearly half of the subpoena's nineteen descriptive categories, reflect the transactions, trading patterns and names of persons who operate in the markets. Thus we are called upon to measure the impact of Section 8 on the production demanded by the subpoena to the extent that information of this character would be divulged; and on this issue the court is divided. I now set forth my views, which are in the minority. Judge Leventhal, with whom Chief Judge Bazelon concurs, thereafter states impressively the majority position.

This question seems to have been squarely presented in only one reported case, Rosee v. Chicago Board of Trade.[78] The allegation there in substance was that the Board and various individuals, including two employees of the Commodity Exchange Authority, had conspired to wrongfully bar the plaintiff's membership on the Board and to destroy his business as a commodity trader. A subpoena was issued for the production of various items, including audit reports and worksheets prepared by the Authority and daily reports filed with it, and the documents in each category reflected the trades and trading positions of numerous individuals, many not parties to the suit. In holding that Section 8 did not prohibit such a disclosure responsive to a subpoena, the court said:

"While the section restricts the data which the Secretary of Agriculture may 'publish' its language would not appear to relate to disclosures pursuant to discovery proceedings under the Federal Rules of Civil Procedure and subject to supervision by the Court. Disclosure in these instances is not a publication. By protective order, the Court can limit the use of the information as is appropriate. Moreover, documents produced on discovery are not open to the public and even if subsequently received in evidence may be withheld from public inspection if necessary.

"Where Congress has intended to proscribe the use of government-held data in judicial proceedings, it has not talked in terms of 'publish' or 'publication.' Rather, it has expressed the prohibition explicitly. See e. g., Federal Aviation Act of 1958, § 701, 49 U.S.C. § 1441(e); Act of May 6, 1910, c. 208, § 4, 36 Stat. 351 (1910), 45 U.S.C. § 41 (railroad accident investigations); Act of August 10, 1956, c. 1041, 70A Stat. 748 (1956), 10 U.S.C. § 7724 (information regarding naval vessels); P.L. 85–857, September 2, 1958, 72 Stat. 1236 (1958), 38 U.S.C. § 3301 (information in Veterans' Administration records).

"It should be noted that some of the information here sought relates to transactions five or more years ago. Some also may clarify one way or the other plaintiff's charges of misconduct against subordinates in the Department of Agriculture. The language of Section 8 does not, in the Court's opinion, warrant the conclusion that Congress intended to preclude examination of such documents in judicial proceedings." [79]

77. See notes 7 to 9, *supra,* and related text.

78. 35 F.R.D. 512 (N.D.Ill.1964), 36 F.R. D. 684 (N.D.Ill.1965).

79. 35 F.R.D. at 515. Later the court somewhat elaborated its view:
   " * * * The Authority, however, suggests two additional reasons for non-disclosure. The information con-

Unlike my colleagues, I am unable to adopt this construction. My reading of Section 8 does not leave me nearly so confident that Congress contemplated a distinction between voluntary and subpoenaed productions, or intended to exempt from the ban of that section productions in discovery proceedings, even though subject to supervision by the court. On the contrary, the bare language of the section seems to me to be susceptible to interpretation either way.[80] Consequently, I feel a need to probe the legislative history and administrative interpretation of Section 8 for enlightment as to the choice properly to be made.

The provision that is now Section 8 originated in the Future Trading Act[81] and, after its ill-fated existence,[82] was incorporated in the Grain Futures Act,[83] the successor statute. In 1936, Congress substantially amended the Grain Futures Act[84] and reenacted it as the Commodity Exchange Act.[85]

These acts were designed to provide federal supervision and regulation of commodity markets and to eradicate "sudden or unreasonable" price fluctuations resulting from speculation, manipulation and control,[86] and to this end the Secretary was given extensive powers of investigation. Congress recognized,

tained in the audits relates, in part, to the trades and trading positions of various individuals, many of whom are not defendants in the instant case. First, the Authority restates its position that § 8 of the Commodity Exchange Act, 7 U.S.C. § 12, prohibits the publication of such data. This contention was considered fully and disposed of in our earlier opinion. Disclosure pursuant to discovery proceedings is not a 'publication,' as that term is used in the Act. Second, the Authority points to its obligation to traders and to the general public, suggesting that confidentiality is required in order to assure the accuracy of reported data and to protect the business privacy of 'hedgers' and 'legitimate capitalists', enabling them to engage in hedging and other speculative transactions necessary to the maintenance of stable commodity markets.

"These considerations, while important, have little relevance under the circumstances of this case. The Authority has sufficient investigative authority and sanctions at its disposal to assure the accuracy of required reports and records. The information sought by the plaintiff involves activity which took place from four to six years ago. None of the trades remains 'open' as of this date and the data would in no way compromise the positions of persons currently trading. If the Authority has any reason to believe that disclosure of these documents will have specific adverse effects, it may submit a draft of a protective order to prevent any possible misuse of the information to be supplied." 36 F.R.D. at 690–91.

80. Compare Zemel v. Rusk, 381 U.S. 1, 8, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965);

Magruder v. Washington, B. & A. Realty Corp., 316 U.S. 69, 73, 62 S.Ct. 922, 86 L.Ed. 1278 (1942); Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 113–114, 59 S.Ct. 423, 83 L.Ed. 536 (1939). See also Morrissey v. Commissioner of Internal Revenue, 296 U.S. 344, 354–355, 56 S.Ct. 289, 80 L.Ed. 263 (1935).

81. Future Trading Act § 9, 42 Stat. 187 (1921).

82. See Hill v. Wallace, 259 U.S. 44, 42 S. Ct. 453, 66 L.Ed. 822 (1922).

83. Grain Futures Act § 8, 42 Stat. 998 (1922).

84. But no material change was made in what is now Section 8.

85. *Supra* note 5.

86. "Transactions in commodity involving the sale thereof for future delivery as commonly conducted on boards of trade and known as 'futures' are affected with a national public interest; such transactions are carried on in large volume by the public generally and by persons engaged in the business of buying and selling commodity and the products and byproducts thereof in interstate commerce; the prices involved in such transactions are generally quoted and disseminated throughout the United States and in foreign countries as a basis for determining the prices to the producer and the consumer of commodity and the products and byproducts thereof and to facilitate the movements thereof in interstate commerce; such transactions are utilized by shippers, dealers, millers, and others engaged in handling commodity and the products and byproducts thereof in interstate commerce as a means of hedging themselves against possible loss through fluctuations in price; the transactions

however, that many commodity trades serve an economically useful and essential purpose by enabling those who produce, process and handle grain and grain products to hedge themselves against possible loss resulting from changing prices,[87] and that hedging is impossible without corresponding speculation on prospective fluctuations.[88] Congress also realized that neither operation—hedging or responsible speculation—is feasible if it is subjected to competitive scrutiny.[89] The legislative scheme was to enable the Secretary to oversee the operation of commodity markets without opening to the public eye the data indispensable to this function.[90] And the need for maintaining the seclusion of legitimate commodity deals has necessarily concerned the Secretary as well.

What is now Section 8 has, in substantially its present form, enjoyed a combinational existence and operation through three acts for the period of more than two generations. From its inception, the Department of Agriculture has consistently interpreted it as a prohibition on the divulgence of information respecting individual market transactions, trading patterns or participating customers, except as necessary in proceedings under the act and or as specifically authorized by the act. This ad-

ministrative construction has several times been brought to the attention of Congress, which despite its making other changes in the legislation, has left the Section 8 restriction on disclosure substantially intact.

During the hearings preceding the enactment of the Commodity Exchange Act, frequent reference was made to the fact that the Department of Agriculture had administratively interpreted its predecessor, the Grain Futures Act, as imposing the lid of secrecy upon all statutorily unexcepted transactions of specific persons, and all trade secrets and names of customers. Dr. J. W. T. Duvel, chief of the Grain Futures Administration, testified that its officials were thereby prohibited from revealing the names of traders except those found guilty of some violation, in which case the disclosure was made through a public hearing as provided by law.[91] Solicitor Thomas of the Department reiterated its construction that the Act banned disclosure of such information unless the traders to whom it pertained were guilty of illegal acts.[92] Department representatives refused to make available to the House Committee on Agriculture the names on a list for future investigation, asserting as ground that because it had not been determined that the persons

---

and prices of commodity on such boards of trade are susceptible to speculation, manipulation, and control and sudden or unreasonable fluctuations in the prices thereof frequently occur as a result of such speculation, manipulation, or control, which are detrimental to the producer or the consumer and the persons handling commodity and products and byproducts thereof in interstate commerce, and such fluctuations in prices are an obstruction to and a burden upon interstate commerce in commodity and the products and byproducts thereof and render regulation imperative for the protection of such commerce and the national public, interest therein." Commodity Exchange Act § 3, 7 U.S.C. § 5. Substantially the same provision appeared in the Grain Futures Act § 3, 42 Stat. 999 (1922). See also Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 37, 43 S.Ct. 470, 67 L.Ed. 839 (1923); Moore v. Chicago Mercantile Exch., 90 F.2d 735, 740–

741 (7th Cir.), cert. denied 302 U.S. 710, 58 S.Ct. 30, 82 L.Ed. 548 (1937).

87. See note 86, *supra.* See also S.Rep. No. 212, 67th Cong., 1st Sess. 4 (1921); S.Rep. No. 871, 67th Cong., 2d Sess. 3–4 (1922); 61 Cong.Rec. 1321–22, 1328, 4762, 4768 (1921); 62 Cong.Rec. 9447 (1922); 80 Cong.Rec. 6161, 8012 (1936).

88. Public speculation helps carry the risk for producers and others who wish to hedge their cash grain transactions. S. Rep. No. 871, 67th Cong., 2d Sess. 3 (1922); 61 Cong.Rec. 1328 (1921).

89. 61 Cong.Rec. 1321 (1921). See also note 96, *infra,* and related text.

90. See note 102, *infra.*

91. Hearings on H.R. 8829 Before the House Comm. on Agriculture, 73rd Cong., 2d Sess. 24 (1934).

92. Hearings on H.R. 3009 Before the House Comm. on Agriculture, 74th Cong., 1st Sess. 68 (1935).

listed had infringed the Act, the Secretary lacked the authority to bare their names.[93] In response to Senate resolutions, the Administration had furnished Congress with information, but the traders had been assigned numbers so that their individual activities could be followed through but their identity protected.[94]

It was also emphasized that the data contained in the reports the Secretary required of market traders had to be kept confidential in order to protect their business privacy.[95] When requested by the House Committee on Agriculture to furnish the names of brokers engaged in questionable transactions, Dr. Duvel explained that "[t]o disclose names of large traders and their market positions would, of course, place large traders at a great disadvantage and would make operation impossible." [96]

The Department's view as to the Section 8 limitation on the Secretary's authority caused it to balk at favorable responses even to congressional demands under that section for information relative to trading on the commodity mar-

kets. In 1928, the Senate adopted a resolution directing the Secretary to investigate and report to it the names of traders holding speculative positions.[97] Secretary Jardine declined to furnish this information on the ground that Section 8 forbade the identification of specific traders and their activities.[98] History was repeated in 1933 when, following a similar Senate resolution,[99] Secretary Wallace likewise refused.[100]

Perhaps the most remarkable episode occurred in 1947, when the Senate Committee on Appropriations requested Secretary Anderson to reveal in executive session the names of speculators and the amounts of their purchases "together with all other information disclosed by your investigations relative to transactions in commodities on the various boards of trade." [101] On the basis of an opinion by Solicitor Hunter of the Department which, relying on previous judicial [102] and administrative constructions, denied the Secretary's authority, [103] the Secretary replied that Section 8 precluded compliance with the request.[104] He suggested, however, a joint

93. Hearings on H.R. 3009, *supra* note 92, at 67–69.

94. Hearings on H.R. 8829, *supra* note 91, at 22–23.

95. See 61 Cong.Rec. 1321 (1921).

96. Hearings on H.R. 8829, *supra* note 91, at 22–23.

97. S.Res. No. 40, 70th Cong., 1st Sess., 69 Cong.Rec. 3350 (1928).

98. S.Doc. No. 264, 70th Cong., 2d Sess. (1928). 70 Cong.Rec. 4982 (1929).

99. S.Res. No. 376, 72nd Cong., 2d Sess., 76 Cong.Rec. 5310–11 (1933).

100. S.Doc. No. 61, 73rd Cong., 1st Sess., 76 Cong.Rec. 3381 (1933).

101. 93 Cong.Rec. 11616 (1947).

102. Nearly a quarter of a century ago, the provisions of the Grain Futures Act and the Secretary's regulations requiring reports were placed under attack in the courts. In that litigation, Bartlett Frazier Co. v. Hyde, 56 F.2d 245 (N.D. Ill.1932), the District Court for the Northern District of Illinois sustained the Secretary's authority to promulgate such regulations in the face of a chal-

lenge on constitutional grounds that the filing of current reports unrelated to any specific investigation could not be exacted. Id. at 246. The Seventh Circuit, on appeal, affirmed this holding, ruling specifically that Section 8 of the Act placed upon information so obtained the seal of confidentiality. 65 F.2d 350 (1933). "Section 8," it said, "forbids the revealing by the Secretary and his assistants of individual trades and of customers; and the findings here, predicated on the evidence, show that in the decade of experience since the act became operative no instances appear where any such confidence has been violated * * *." 65 F.2d at 352. The Supreme Court denied a petition for a writ of *certiorari*, 290 U.S. 654, 54 S.Ct. 70, 78 L.Ed. 567 (1933). This decision was brought to the attention of Congress through Solicitor Hunter's opinion, which was placed in the record. 93 Cong.Rec. 11617 (1947).

103. 93 Cong.Rec. 11617 (1947).

104. 93 Cong.Rec. 11616 (1947). The Secretary pointed out that "[t]he request calls for disclosure of the names and separate business transactions of per-

resolution which would legalize the disclosure. Congress immediately adopted such a resolution, which remains a provision of the Act,[105] effectuating the Secretary's recommendation on a broader basis.[106]

By my appraisal, these events are of great significance in the determination we are called upon to make. For nearly a half-century, the Secretary has construed Section 8 and its forerunners as a prohibition on the divulgence, except to the extent expressly authorized by the act, of information derived from reports filed compliably with his regulations. This interpretation, supported in history and reason, has been uniform and unequivocal and, with little apparent dissent, has been accepted and acted upon by those who participate in market operations. "The interpretation expressly placed on a statute by those charged with its administration must be given weight by courts faced with the task of construing the statute."[107] And administrative "practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new."[108]

Moreover, when in 1936 Congress reenacted the amended Grain Futures Act as the Commodity Exchange Act, this administrative interpretation was brought to its attention,[109] but it adopted the provision which is now Section 8 without material change.[110] Even more strikingly in 1947, when Secretary Anderson advanced the administrative construction of Section 8 as a reason for declining revelation to a congressional committee, Congress reacted by the passage of a new provision relaxing the Section 8 proscription, but solely in the Secretary's discretion or at the request of a congressional committee.[111] And very recently, Congress amended Section 8 but, despite additional reference to the Secretary's view on permissible public disclosure,[112] only to allow discretionary

---

sons trading in commodity futures whose trades and market positions are reported in confidence to the Department of Agriculture. These reports are obtained currently under authority of the Commodity Exchange Act," Section 8 of which prohibited disclosure. *Ibid.*

The Secretary emphasized that he felt precluded by the Act from revealing to the committee the information it sought, but that he would not defy the committee in the event that it did not see fit to adopt his suggestion, and that he would make the disclosure if the committee insisted. 93 Cong.Rec. 11613 (1947).

105. 61 Stat. 941 (1947), 7 U.S.C. § 12–1.

106. As originally presented, the joint resolution would have authorized disclosure of the information only when requested by a congressional committee. 93 Cong. Rec. 11612 (1947). Senator Barkley voiced the objection that this was too restrictive and urged that the Secretary should be given discretionary authority to release the information to the public without awaiting a committee's call for it. *Id.* at 11617–18. The Senator emphasized that public dissemination of the information was to be a matter of judgment by the Secretary. *Id.* at 11618, 11619. This view as to what the new provision should contain ultimately prevailed, and the original proposal was amended accordingly. *Id.* at 11618–21.

107. Zemel v. Rusk, *supra* note 80, 381 U. S. at 11, 85 S.Ct. at 1278. See also Udall v. Tallman, 380 U.S. 1, 11, 85 S. Ct. 792, 13 L.Ed.2d 616 (1965); Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); Skidmore v. Swift & Co., 323 U.S. 134, 139–140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

108. Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S. Ct. 350, 358, 77 L.Ed. 796 (1933). See also Udall v. Tallman, *supra* note 107, 380 U.S. at 11, 85 S.Ct. 792; Power Reactor Development Co. v. International Union of Electricians etc., 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); United States v. American Trucking Ass'n, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Fawcus Mach. Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397 (1931).

109. See notes 91 to 94, *supra*, and related text.

110. 49 Stat. 1491 (1936).

111. 61 Stat. 941 (1947), 7 U.S.C. § 12–1.

112. Hearings on H.R. 11930 and 12317 Before the House Comm. on Agriculture, 90th Cong., 1st Sess. 84–85 (1967).

divulgence to federal executive departments and agencies.[113] These developments, to me, indicate persuasively that Congress intended that in other respects the Secretary's interpretation of Section 8 should stand.[114]

I note, too, that each of the several provisions[115] of the Act empowering the Secretary, in the absence of congressional demand, to disclose information otherwise confidential is completely harmonious with this tenet.[116] I look also to the clear purposes of the Act, the relationship of the Secretary's reporting requirements to attainment of its goals, and the uncontradicted showing that unselective dissemination of information generated thereby would have undesirable if not disastrous consequences on the commodity markets.[117] The cumulative weight of these considerations leads me to the conclusion that, save as otherwise explicitly provided in the Act,[118] Section 8 forecloses the production of documents which would reveal the transactions, business secrets or names of those who trade on the commodity markets.[119]

113. By the amendment, "when requested by any department or agency of the executive branch of the Government of the United States, acting within the scope of its jurisdiction, [the secretary] may, in his discretion, furnish to such department or agency any information in the possession of the Department of Agriculture obtained in connection with the administration of this chapter: *Provided, however,* That information so furnished to any such department or agency shall not be disclosed by such department or agency except in any action or proceeding under the laws of the United States to which it, or the Secretary of Agriculture, or the United States is a party." Pub.L. 90–258 § 19(b) (1968).

114. See Zemel v. Rusk, *supra* note 80, 381 U.S. at 11–12, 85 S.Ct. 1271, 14 L.Ed. 2d 179; Boesche v. Udall, 373 U.S. 472, 483, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963); Cammarano v. United States, 358 U.S. 498, 510–511, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959); Helvering v. R. J. Reynolds Tobacco Co., *supra* note 80, 306 U.S. at 115, 59 S.Ct. 423; Massachusetts Mutual Life Ins. Co. v. United States, 288 U.S. 269, 273, 53 S.Ct. 337, 77 L.Ed. 739 (1933).

115. These include the two provisos to Section 8, referred to in notes 49 and 113, *supra,* and the two provisions now codified as 7 U.S.C. §§ 12–1 and 12a(6).

116. In each instance, disclosure or nondisclosure, except when pursuant to the request of a congressional committee, is a matter committed wholly to the Secretary's discretion. See also note 123, *infra.*

117. In the proceeding under review the Secretary filed an affidavit stating in part:
"A disclosure of names and addresses of 'hedgers' and their transactions would reveal to their competitors the extent of their involvement in merchandizing, storing, or processing a commodity because of the usually close relationship between the futures position and the total volume of their actual commodity operations, e. g. inventory holdings. It would disclose to competitors the pattern of trading followed by the trader and serve as an indicator of the normal trading that could be expected to be done by such trader in the future. * * *
"The impact of such disclosure would tend to cause substantial traders, particularly hedgers, to curtail their operations and withdraw from the futures markets, thus denying them the price protection advantages afforded by the futures market and quite possibly forcing them to change their pricing practices with respect to the products they sell so as to compensate for the increase in the price risk during the period in which a commodity is being held, merchandized, or processed. This could result in lower prices to producers and higher prices for consumers. The withdrawal from the futures market of persons engaged in merchandizing, storing and processing commodities would make the markets largely speculative in character and deprive them of the stabilizing effect of the participation of the cash interests and diminish their utility as indicators of the market values of cash commodities. This could result in destroying the value of the futures markets and thus adversely affect the public interests."

118. See the provisions referred to in note 115, *supra.* And see note 123, *infra.*

119. The recent legislation enlarging public access to Government records, see note 70, *supra,* also exempts "trade se-

Viewed against its historical backdrop, I cannot read into Section 8, as my brethren do, an exception for the situation where disclosure is sought in a judicial proceeding, albeit one in which republication presumably can be outlawed by a protective order. For that history has been one of steadfast adherence by the Department through the years to the section's prohibitory language in its widest and strictest sense. No exemption has been yielded to the Department's Section 8 policy—of no disclosure to anyone under any circumstances. So all-embracive has been this administrative injunction that it has engendered three confrontations with Congress itself on requests for information [120]—one, in 1947, for use by a congressional committee in executive session.[121]

From the beginning of commodity market regulation, Congress has, quite orthodoxly, defined for the Secretary a broad role in the administration of the Act. His is the task of policing the markets with a view to eradication of their ills and their evils; also his is the heavy responsibility of weighing competing considerations in every situation in which an authorized divulgence of confidential information other than to Congress is at stake.[122] And the undeviating congressional response to exigent circumstances plausibly warranting an informational disclosure, save only where Congress itself makes the demand, has been to entrust the decision entirely to the Secretary's discretion.[123] Thus, with ample opportunity to make changes, Congress has not seen fit to open the door wide

crets and commercial or financial information obtained from any person as privileged or confidential." 5 U.S.C. § 552 (b) (4). As the House report states, "[t]his exemption would assure the confidentiality of information obtained by the Government through questionnaires or through materials submitted and disclosures made in procedures such as the mediation of labor-management controversies. It exempts such material if it would not customarily be made public by the person from whom it was obtained by the Government. The exemption would include business sales statistics, inventories, customer lists, scientific or manufacturing processes or developments, and negotiation positions or requirements in the case of labor-management mediations. It would include information customarily subject to the doctor-patient, lawyer-client, or lender-borrower privileges such as technical or financial data submitted by an applicant to a Government lending or loan guarantee agency. It would also include information which is given to an agency in confidence, since a citizen must be able to confide in his Government. Moreover, when the Government has obligated itself in good faith not to disclose documents or information which it receives, it should be able to honor such obligations." H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966), U.S.Code Cong. & Admin.News 1966, p. 2427. See also S.Rep. No. 813, 89th Cong., 2d Sess. 9 (1965).

120. See the text *supra* at notes 97 to 106.

121. The request of the Senate Committee on Appropriations contemplated a disclosure for the Committee's own use. See note 101, *supra*, and accompanying text. The Secretary's negative response was predicated upon the view that the Act precluded even that sort of divulgence. See notes 102–04, *supra*, and accompanying text. The Secretary, in recommending the joint resolution to validate his compliance, pointed to the desirability of making the requested information available to the public, 93 Cong.Rec. 11616 (1947), and the resolution incorporated this suggestion. *Id.* at 11613, 11616–21. See also note 106, *supra*.

122. See the provisions referred to in note 115, *supra*.

123. The Secretary's discretion as to disclosure is invoked where "any board" or "any person" has been "found guilty of violating the provisions of" the Act, Commodity Exchange Act § 8, 7 U.S.C. § 12; where the Secretary is "requested by any department or agency of the executive branch of the Government of the United States, acting within the scope of its jurisdiction," *ibid.*; and where "any transaction or market operation, * * * in the judgment of the Secretary * * * disrupts or tends to disrupt any market or is otherwise harmful or against the best interests of producers and consumers." Commodity Exchange Act § 8a(6), 7 U.S.C. § 12a(6). And see 7 U.S.C. § 12–1.

enough to otherwise accommodate the trustee's claim,[124] and I do not feel that I have the freedom to do so.[125]

LEVENTHAL, Circuit Judge, with whom BAZELON, Chief Judge, concurs:

We hold that Section 8 of the Commodity Exchange Act [1]—which says that the Secretary of Agriculture may not "publish" "business transactions of any person and trade secrets or names of customers"—does not bar the Secretary's compliance with this subpoena. We find persuasive Judge Will's decision in Rosee v. Chicago Board of Trade [2] that limited disclosure in judicial proceedings, carefully curtained by judicious use of protective orders authorized by Rule 30,[3] is not a publishing barred by the section.

Judge Robinson's scholarly opinion makes unnecessary an extensive review in this opinion of the history pertinent to this provision. As he has noted we disagree with the conclusion in part VI of his opinion. We shall first outline, and subsequently amplify, what we consider the cardinal considerations.

The core issue is whether Congress has determined to foreclose a litigant from getting from the Secretary information necessary to enforce his legal rights, where those who reported the information to the Secretary could be compelled by this litigant to produce it in individual proceedings, were such proceedings feasible as a practical matter.

■ The principle favoring full access by the courts and litigants to relevant information, in the absence of strong competing considerations, is an important foundation for the achievement of justice by the courts in individual lawsuits. This principle is national policy of high rank, wholeheartedly endorsed and furthered by Congress. In the absence of a specific prohibition against disclosure in judicial proceedings, such as Congress set forth in some statutes, clear and strong indication is required before it may be implied that the policy of prohibition is of such force as to dominate the broad objective of doing justice. That kind of indication is not provided by Section 8, where both the

---

124. The doctrine of privilege epitomizes a sacrifice of a potentially helpful source of evidence to an interest legislatively or judicially deemed more important to society as a whole. The Act, as I read it in the light of its legislative and administrative history, commits the judgment to the Secretary except where the information is sought by a committee of Congress, and I am unwilling to attribute to the Secretary a lack of appropriate concern over litigants' needs for relevant evidence in his hands. In this case, while the trustee estimates on the basis of information assembled from outside sources that the bankrupt's losses may have been caused by a manipulation or corner on the commodity markets, the Secretary conducted an investigation of the markets and concluded to the contrary.

125. I have referred to provisions in the Act which exempt information from the confidentiality requirement of Section 8. See notes 49, 113, 115, 116 and 123, *supra*, and accompanying text. My colleagues' position that the production required by a subpoena is not a publication barred by Section 8 renders superfluous further discussion of those provisions. Suffice it to say, my conclusion is that in

the circumstances the Secretary did not abuse his discretion in declining to make disclosure pursuant to them.

1. 7 U.S.C. § 12, as amended by P.L. 90–258 § 19(B) (1968).

2. 35 F.R.D. 512 (N.D.Ill.1964), 36 F.R.D. 684 (1965).

3. As Judge Robinson makes clear, text at notes 27–30, General Orders 22 and 37 provide that the Federal Rules of Civil Procedure are applicable in bankruptcy examinations to the extent not inconsistent with the Bankruptcy Act. Subpoenas duces tecum, authorized by Federal Rule 45, are subject to the court's Rule 30 power to guard witnesses by protective orders limiting discovery. Rule 30(b) authorizes the court to order, for example, "that the scope of the examination shall be limited to certain matters, or that the examination shall be held with no one present except the parties to the action and their officers or counsel * * * or that secret processes, developments, or research need not be disclosed * * * or the court may make any other order which justice requires to protect the party or witness from annoyance, embarassment, or oppression."

language used and the statutory setting plainly reflect Congressional concern with widespread dissemination of information not otherwise available to the public, and not with disclosure in judicial proceedings. Moreover, the nature of the need for secrecy in futures trading gives credence to that distinction.

No regulatory objective is seriously impaired by limited, judicially-supervised disclosure in court litigation, and the allegations of the Secretary, carefully read, do not refute this. There is nothing to show that such disclosure under judicial restraints was ever presented to or considered by the Congress as a condition that could not be accepted in the public interest.

1. The statutory setting is important in construing what Congress meant by the prohibition on publishing. Section 8 authorizes the Secretary of Agriculture to investigate the operations of Boards of Trade and to "publish" the results of his investigations and statistical information compiled therein. That section also commands the Secretary to "investigate" marketing conditions of commodity products, including supply, demand and transportation costs, and to "compile and furnish" this information to producers, consumers, and distributors. In performing these functions, however, the Secretary may not publish "data and information which would separately disclose the business transactions of any person and trade secrets or names of customers." The bar to publication is linked to, and should be read against the backdrop of, the Secretary's duties under the Act to furnish information and data about futures trading and commodities to the concerned public at large.

It should be emphasized that trading in futures is a key part of the process by which commodities are marketed in this country. While facilitation of hedging is one important function served by futures trading, such trading also has the broader significance of furnishing estimates of the prices at which future commodity sales will be transacted. The market reflects the judgments of a wide array of buyers and sellers, many with experience and information on one or more of the factors governing ultimate supply and demand—weather forecasts; export trade; components of domestic demand, consumer and industrial; Government programs in effect and under consideration; etc. The futures prices arrived at in a free market may be of crucial importance in the decision making—i. e. what to grow, when to market—of the groups that make up the agricultural sector. Information concerning futures markets is vital because that is the forum in which the spectrum of uncertainties about the future, some promising and others not, is fashioned by the market mechanism into a dollars-and-cents price.

What Section 8 is primarily concerned with is authorization of publication, with the Secretary giving widespread publicity to information about the futures markets. Similarly, its limitations on publishing are directed primarily to that problem. We do not say that this defines the prohibition, but it does establish as a matter of fair implication that the prohibition was not intended to embrace the separate and limited kind of disclosure that arises in judicial proceedings.[4]

2. Looking to the purposes of the Commodity Exchange Act, we find further support for our conclusion. That Act provides limited supervision to promote a broader freedom. It is designed to ensure an efficient and free futures trading, free of the restraint of manipulation.

The Act contemplates freedom for speculators not engaged in manipulation. From the beginning of regulation of fu-

---

4. Indeed, the basic institutional role of the Department of Agriculture is that of supplying information. Its authorizing legislation sets forth that the Department is "to acquire and to diffuse among the people of the United States useful information on subjects connected with agriculture, in the most general and comprehensive sense of that word * * *." 7 U.S.C. § 2201 (Supp.1967).

tures trading it has been undisputed that widespread publication of information as to who was holding what, would be disruptive of the smooth functioning of the commodity markets. Those markets require a substantial number of speculative transactions for growers and processors to "hedge," thereby protecting themselves against fluctuations in commodity prices.[5] This speculation, at least by large traders, requires some secrecy. Furthermore, publication would reveal the actual commodity holdings of the hedgers, because these hedges reflect actual commitments. These are trade secrets, and the secrecy required is furnished by the statute.

No similar danger to the regulatory scheme is posed by limited disclosure pursuant to subpoena in judicial proceedings, safeguarded by a Rule 30 order. In our opinion compliance with the subpoena is not a Section 8 publishing, and imposes absolutely no requirement on the Secretary to publish to the world those items he has delivered under subpoena to the person and at the place designated by the court. Nothing in the affidavit of the administrator of the Commodity Exchange Authority is to the contrary. Yet the parade of horrors projected by the Secretary as a result of compliance with the subpoena, hedgers withdrawing from futures trading, etc., marches on the assumption that he must go beyond the subpoena and make this information public. That is not so.

There is no reason why the court cannot also ensure that this information is not released by appellee. The courts routinely handle situations where litigation discovery trenches on competitors' rights to secrecy by using their powers under Rule 30. The courts can limit, and in actual practice do limit, the persons having access to information, their freedom to discuss the information to which they are given access, and the uses to which the information may be put.[6] No great outcry has arisen that information thus restricted has been leaked, or put to improper uses, by attorneys who are sworn officers of the court. One technique available for sealing off discovery is delay in any necessary disclosure. In the case before us any possibility of market disruption by release of the information involved is greatly lessened, if not entirely dissipated, by the fact that the transactions involved have long since been closed out.

Finally, like Judge Will in *Rosee, supra,* we are convinced that the Commodity Exchange Authority's administration of its reporting requirements will not be hampered by this limited disclosure. It has ample means of checking misreporting.

■ 3. Our judgment that "publish" does not comprehend disclosure in judicial proceedings is not undercut by any instances of Congressional acquiescence in that interpretation of the statute by the Secretary. It is at least doubtful whether the measures used by Congressional committees to obtain information they desire of the Secretary can even be taken as acquiescence in the Secretary's construction of the statute as precluding his release to Congressional committees.[7]

---

5. A futures contract commits the buyer and seller respectively to take or make delivery of the contracted quantity at a given date in the future. A person who has commodities, or is committed to supplying them in the future, can shift the risk of price changes to speculators by purchasing a futures contract which commits someone else to take delivery from him, or supply him, at the present "future" price. Thus any losses occasioned in one transaction will be made up in the other.

6. *See, e. g.,* Covey Oil Co. v. Continental Oil Co., 340 F.2d 993, 999 (10th Cir.), cert. denied, 380 U.S. 964, 85 S.Ct. 1110, 14 L.Ed.2d 155 (1965); Julius M. Ames Co. v. Bostich, Inc., 235 F.Supp. 856 (S.D.N.Y.1964).

7. In the particularly acid confrontation in 1947, Congress cannot truly be said to have "acquiesced" in the Secretary's statutory construction that Section 8 prohibits disclosure to Congressional committees. Congress, without accepting the correctness of the Secretary's interpretation, thought it the better course to make clear the legality of its action by passing a Joint Resolution, subsequently 7 U.S.C. § 12–1.

But in any event those confrontations have no significant bearing on the issue of limited judicial disclosure. Those confrontations occurred when Congress was prodded by sharp commodity price changes to investigate futures speculation. Because the prices at which futures are traded determine commodity prices across the country, they control how much farmers get for their goods. Any manipulation of futures prices has an enormous effect on people who have no connection with the trading itself. There was widespread denunciation of speculators as people who were "profiteering in human misery," to cite the characterization employed by Attorney General Tom Clark in 1947. The requests for information were by Committees and members of Congress, and there was an obvious likelihood that the information obtained from the Secretary would be made public, indeed very public. Widespread publicity in these inflamed circumstances is markedly different from limited court-supervised disclosure. The various Congressional handlings of the one problem cannot fairly be transformed into a mandate on the other.

■ The primary principle of according justice to litigants, dependent on ascertainment of underlying facts, is not to be subordinated to some other domestic policy as a matter of inference of Congressional intent from ambiguous or inconclusive references. As pointed out by the court in *Rosee, supra*, 35 F.R.D. at 515, in other instances where Congress has thought it necessary to protect against court use of records it has expressly so provided by specific language. We see no warrant for inferring that Congress has so elevated the interest of commodity speculators in privacy that it gives them dominance over basic rules of judicial administration, especially when it is taken into account that courts can and do carefully confine disclosures as narrowly as possible. Whatever the merits of speculative futures trading as a cheap means of facilitating distribution of commodities, the Congressional attitude towards the business has been one of toleration, yes, but one that is resigned and grudging, because of awareness of, coupled with distaste for, the circumstance that such trading is a form of gambling in which uninformed persons lose large sums, often after having participated due to low margin requirements in speculation far beyond their means.

4. In its inception, the statutory bar against publishing of trade secrets, individual business transactions and names of customers, undoubtedly reflected not only Congressional concern lest unwise publication disrupt the Boards of Trade, but also concern for the legitimate privacy interest of the traders who were forced by imposition of federal regulatory power to bare their business affairs to Government scrutiny. The bar on the Secretary's publishing these data is thus a Congressional determination that the advent of regulation was not to be the lever by which private affairs were to become public records. That policy has undoubted vitality still. But it seems most reasonable to infer that this Congressional response reflects recognition that members of the public have no right to this information, and no ability to get it without the Secretary's intervention.

Insofar as the interest protected by Section 8 is business privacy (rather than the need to assure effective functioning and regulation of markets) the decisive consideration that undercuts the Secretary's objection to revealing this information is the fact that appellee has the legal right to get this information by subpoena addressed to the traders themselves.[8] That is a right provided by

---

8. The affidavit of the Commodity Exchange Administrator states that: Many of the futures commission merchants and traders who furnished their views to the Authority opposing the release by the Authority to the petitioner of information within the prohibition of Section 8 indicated their recognition of the fact that their own records were subject to compulsory process on behalf of the petitioner * * *." We do not pass on the point completely, however, as individual traders

rules of judicial administration; and while vindication of that right may be hampered by the expensiveness of legal procedures, which require moving against them individually, that fact is if anything a mischief of the law and not a basis for constructing a legal immunity to resist litigation disclosure. In this aspect, the Secretary's divulgence of information does not shift the balance drawn in private laws between the parties' respective rights to privacy and information. However, as the Secretary may not be prepared, or as well prepared, to argue the privileges of the various traders, we direct that third parties be permitted to intervene for the purpose of asserting any privilege they might have with respect to this information, and be given appropriate notice to make that right of intervention meaningful.[9]

5. We close by reference to the recent statute [10] wherein Congress enacted numerous amendments to the Commodity Exchange Act, including Section 8. These amendments were proposed by the Department of Agriculture, and several were put forth with the explicit purpose of providing express statutory confirmation of long-standing interpretations of the Secretary. Yet despite the judicial rejection of the Secretary's interpretation that Section 8 is an absolute bar to disclosure pursuant to subpoena, no attempt was made to seek Congressional confirmation of the Secretary's approach.[11] This kind of consideration is

neither decisive nor a makeweight. It tends to reinforce the conclusion that we have reached, and to suggest either that compliance with this sort of subpoena does not have any particularly drastic consequence for the Administrator, or that the Administrator is unwilling to press for Congressional resolution.

Our opinion will govern further proceedings under the court's mandate so far as this point is concerned.

---

may have valid defenses against production of data reported by them. It is clear, however, that there is no absolute privilege to decline to produce this information.

9. We suggested this as an appropriate course in Boeing Airplane Co. v. Coggeshall, 108 U.S.App.D.C. 106, 280 F.2d 654 (1960).

10. P.L. 90–258 (1968). See 36 U.S.Law Week 81 (1968).

11. The court in *Rosee, supra* note 2, rejected the Secretary's interpretation of Section 8 in 1964, and reaffirmed its position in an opinion issued in February 1965. Amendments to the Commodity Exchange

Act similar to those of P.L. 90–258 were considered in both 1966 and 1967. The first official action was introduction of the Administration bill H.R. 11788 on October 22, 1965, 111 Cong.Rec. 28659. Hearings thereon were not held until April 1966. See Hearings on H.R. 11788 Before the Subcommittee on Domestic Marketing and Consumer Relations of the House Committee on Agriculture, 89th Cong., 2d Sess., Ser. CC (1966). The bill was redrafted and submitted in the 90th Congress as H.R. 11930, and hearings on it were held in August and September of 1967. See, Hearings on H.R. 11930 and H.R. 12317, Before the House Committee on Agriculture, 90th Cong., 1st Sess., Ser. T (1967).